In re Lowell WEBB, Debtor.

Lowell WEBB, Plaintiff,

v.

FIRST MUTUAL CORPORATION, Goldome, United States Department of Housing and Urban Development, Mid–Penn Consumer Discount and City of Philadelphia, Defendants.

Bankruptcy No. 88–13386S.
Adv. No. 88–2137S.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 24, 1989.

Jerome Brian Blank, Philadelphia, Pa., for debtor.

Peter M. Campanella, Dept. Regional Counsel, Region III, U.S. Dept. of Housing and Urban Development, Philadelphia, Pa., for U.S. Dept. of Housing and Urban Development.

Cynthia E. White, Chief Asst. City Solicitor, Philadelphia, Pa., for City of Philadelphia.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa., for U.S. Dept. of Housing and Urban Development.

Janet L. Gold, Haddonfield, N.J. for First Mut. Corp.

Robert T. Cohen, Philadelphia, Pa., for Goldome Credit Corp.

Edwin Seave, Philadelphia, Pa., for Mid–Penn Consumer Discount Co.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

The instant proceeding involves an attempt by the Debtor, LOWELL WEBB, to utilize 11 U.S.C. § 506(a) to reduce secured claims against his home in the course of his Chapter 13 bankruptcy case. The Debtor's claim is based on the fact that he and his estranged wife are actually only three-thirteenths (3/13) owners of the home, despite the fact that he obtained the loans from the secured claimants on the basis of a deed which recited that he and his wife were the sole owners of the home. Principally because we conclude that proof of the Debtor's intention to deceive the claimants was not a prerequisite to allowing the claimants to successfully defend on the basis of equitable estoppel, we shall deny the Debtor the relief which he seeks in this instant proceeding.

The Debtor filed the underlying individual Chapter 13 bankruptcy case on September 29, 1988. The only matter of any consequence which has occurred in this case thus far is the filing of this adversary proceeding on October 12, 1988. The confirmation hearing has not been initially scheduled until May 25, 1989.

Named as defendants in the proceeding are five parties which the Debtor averred had claims potentially secured by the Debtor's residential realty located at 3204 Winter Street, Philadelphia, Pennsylvania 19104 (hereinafter referred to as "the Premises"). On November 30, 1988, as a result of a colloquy with counsel on the first established trial date of November 29, 1988, we issued a Pre-trial Order providing, *inter alia*, that discovery must be completed by January 18, 1989, and that the trial would take place on January 26, 1989. We resolved a motion of FIRST MUTUAL CORPORATION (hereinafter "1st Mutual"), one of the Defendants, contending that the Debtor had not sufficiently replied to a short set of outstanding interrogatories as of just two weeks before trial, by requiring the Plaintiff to file complete re-

sponses thereto by January 23, 1989, and we maintained the established trial date.

At the completion of the trial on January 26, 1989, we issued an Order, dated January 31, 1989, alerting the parties to the possible pertinency of an Opinion of ours filed that date, *In re Franks*, 95 B.R. 346, 353–54 (Bankr.E.D.Pa.1989), which addressed the issue of equitable estoppel, and scheduled briefing to be due by February 27, 1989 (Debtor), and March 25, 1989 (Defendants). Ultimately, the SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (hereinafter "HUD"), another of the Defendants, ordered a transcript of the trial and requested an extension of time until March 31, 1989, to submit its Brief after review of the transcript. Although we allowed all of the Defendants an extension to file their Briefs until March 31, 1989, only HUD and GOLDOME CREDIT CORPORATION (hereinafter "Goldome") have in fact submitted same.

This matter was properly filed as an adversary proceeding. *See In re Jablonski*, 70 B.R. 381, 385 (Bankr.E.D.Pa.1987), *aff'd*, 88 B.R. 652 (E.D.Pa.1988). We are therefore obliged, pursuant to Bankruptcy Rule (hereinafter "B.Rule") 7052 and Federal Rule of Civil Procedure 52(a), to render our decision in the format of findings of fact and conclusions of law. Pursuant to our Pre-trial Order, the Debtor's counsel drafted a proposed Stipulation of Facts which, in a colloquy with counsel prior to trial, was agreed to in numerous particulars. However, a trial of several hours remained necessary and, as a result of conflicts in the testimony, several factual findings of fact must be made in order to reach a resolution in this matter. Our conclusions of law will serve as headnotes for legal discussions which follow where necessary.

**B. FINDINGS OF FACT**

1. The Premises was purchased by the Debtor's parents, William and Lula Webb (hereinafter all of the Webbs and the Debtor's siblings except the Debtor himself are referred to by their first names), on August 15, 1957. Although the Debtor is 42 years of age, he testified that he was born at the Premises and lived there all of his life.[1]

2. William predeceased Lula. Lula died intestate on November 6, 1974.

3. Lula had 15 children.[2] The two oldest, Jerome and Melvin, were not the children of William.

4. Two of the common children, Susie and Rudine, predeceased Lula. Three others, Jerome (only Lula's child), Ruby, and Theodore died after Lula but prior to the instant trial. Jerome reportedly has left, as his heirs, 20 children and Theodore between 15 and 20. Ruby was married, but the number of her children was not stated.

5. In 1984, the Debtor married a woman named Mona. They separated in 1985, reconciled later that year, and separated again in March, 1988. Although the Debtor claims to have instituted divorce proceedings, they remained legally married at the time of trial.

6. The Debtor is a high school graduate and attended a post-graduate culinary arts school. He worked as a cook and, thereafter, in shipping and receiving at Drexel University for ten years. Presently he is employed as the maintenance manager of a real estate complex containing 52 apartments and 17 stores. He has also been a political committeeman since 1984, and was an unsuccessful candidate for state representative on at least one occasion.

7. In July, 1984, the Debtor attempted to finance home-remodelling work on the Premises through a business called Phila-

---

**1.** Like many assertions of the Debtor, it is not clear how this could be true. It would seem that the Debtor's family could not have lived in the Premises before they bought it in 1957, at which time the Debtor would have been about ten years of age. However, this apparent inconsistency could be explained by the fact that the Debtor's parents were in residence in the Premises as tenants on or some other basis prior to purchasing it.

**2.** The parties' Stipulation states 14, but the listing omits the second of Lula's issue prior to her marriage to William, Melvin (Honey) Pearson.

delphia Builders and Remodelers (hereinafter "Builders"). However, he was unable to get a home-improvement loan because the Premises remained titled to his late parents.

8. At the suggestion of an individual associated with Builders named Ed Gorman, the Debtor attempted to circulate what he referred to as a "letter" to each of his siblings, which, by signing, would indicate their agreement that they claimed no interest in the Premises. However, one of the Debtor's brothers (William) frustrated this plan by refusing to sign or further circulate the document, and apparently destroying it.

9. The Debtor then contacted the office of Commonwealth Land Title Insurance Company (hereinafter "Commonwealth") at 6515 Haverford Avenue, Philadelphia, Pennsylvania, and, after making an appointment, appeared in that office on September 17, 1984, with his brother Creadell, his sister Ruby, their spouses, and Mona; and these parties only executed a deed prepared at that time which purported to vest complete title to the Premises exclusively in his and Mona's names. The deed, prominently and incorrectly, states, on its first page, that Lula died intestate in 1974, leaving only Creadell, Ruby, and the Debtor as surviving issue, and that it effected a conveyance of a ⅔ interest in the Premises to the Debtor and Mona.

10. Solomon Magid (hereinafter "Magid"), the manager of the above-referred Commonwealth office since 1974, testified that the office regularly prepared uninsured deeds for members of the community as a service at a cost of about $37.50 apiece. Magid produced a log which referenced the preparation of the deed in question by him, although Magid stated that he no longer had any independent recollection whatsoever of this transaction.

11. The Debtor testified that Creadell and Ruby advised Magid at the office encounter on September 17, 1984, that there were other living heirs of Lula who were not present; that he (the Debtor) never read the recitals in the deed; and that he believed that it validly conveyed title to him and Mona.

12. Creadell, however, testified that he was "running late" on the date in question, left all of the matters concerning the preparation of the deed to the Debtor, and merely appeared to quickly sign the deed without reviewing it.

13. Ruby is deceased and none of the siblings' spouses were called as witnesses.

14. Magid stated that it would have been completely contrary to his policies to have prepared the deed as it had been if he had been informed that Lula had other heirs that did not predecease her.

15. Having nevertheless obtained a deed placing title to the Premises in exclusively his and Mona's names, the Debtor and Mona were able to obtain the following loans secured by mortgages on the otherwise-unencumbered Premises:

a. Defendant MID–PENN CONSUMER DISCOUNT COMPANY (hereinafter "Mid–Penn"), on November 9, 1984, in an amount of about $2,000.

b. Goldome, which financed the transaction for Builders that gave rise to the preparation of the deed, in late 1984, in an amount in excess of $12,000.

c. 1st Mutual, on December 10, 1984, in the amount of $7,372.92.

d. BEREAN SAVINGS & LOAN ASSOCIATION (hereinafter "Berean"), HUD's assignor, on April 15, 1985, in the amount of $15,000.

16. In applying for the loans from Goldome/Builders, 1st Mutual, and HUD/Berean, the Debtor did not divulge any of his other prior loans, except for disclosing outstanding loans to Mid–Penn and "Provident Bank"[3] in connection with the HUD/Berean loan.

17. The application of the Debtor for the loans from Builders and Berean indi-

---

**3.** This is an apparently erroneous reference to a previous loan of the Debtor only from Provident Consumer Discount Co., which was liquidated with the proceeds of the 1st Mutual loan.

cated that the proceeds were to be used for financing improvements to the Premises.

18. The Debtor attributed his failure to disclose his prior loans to the respective lenders to the facts that (1) each of the loans had been arranged by an intermediary to whom he had fully explained his circumstances and who he assumed conveyed same accurately to the lenders; and (2) his articulated belief that it was unnecessary to read legal documents such as loan applications (and the September 17, 1984, deed).

19. A substantial portion of the proceeds of the Berean/HUD loan was not used for home improvements, which was its stated purpose. Rather, the proceeds were used, in large part, by Mona, to finance a custody case, purchase of Christmas presents, and for her living expenses during the separation in 1985.[4]

20. The Chapter 13 Statement filed in a prior joint bankruptcy brought by the Debtor and Mona, Bankr. No. 86–05618S, in which their counsel was David Offen, Esquire, an experienced bankruptcy practitioner, and the Statement filed by his present counsel in the instant case make no mention of the interest of any other parties in the Premises and are hence fairly read as providing that he and Mona are the sole owners of the Premises.

21. The Debtor appeared, despite his employment and political attainments, as sufficiently unsophisticated and incapable of elementary logical deduction that it is possible that he did not misrepresent the status of his mother's lineage to Magid with fraudulent intent. However, Magid impressed us as careful and credible, and we cannot perceive any incentive on his part to prepare a fraudulent deed. Since even Creadell's testimony did not support the Debtor's contention that Magid was expressly informed of Lula's other heirs during the office appointment, we conclude that the Debtor did misrepresent to Magid that Creadell, Ruby, and he were the only heirs of his mother.

22. At the very least, the Debtor was grossly negligent in not correcting and/or utilizing the erroneous information in the September 17, 1984, deed in his applications for these several loans. The Debtor knew or should have known that these creditors relied upon the contents of the deed as accurate in advancing credit to him and Mona.

23. In addition, the fact that no one—including the lenders' representatives with whom he dealt and at least one of his bankruptcy attorneys—ascertained that other heirs had an interest in the Premises prior to the institution of this action strongly suggests that, contrary to the Debtor's contentions, he did not inform these parties of same. Similarly, it appears that the Debtor intentionally failed to inform the lenders' representatives of the existence of his prior mortgage loans and the purposes for which the loan proceeds were planned to be used.

24. The Debtor therefore presented himself as a totally unreliable witness, and we cannot credit his testimony that he informed Magid or anyone except his present counsel, prior to institution of this lawsuit, about the other heirs of his mother who had an interest in the Premises. Nor can we credit his contentions that he divulged his prior indebtedness and the purposes for which he made the loans in issue to anyone.

25. The value of the Premises (per the parties' stipulation) is "at least $50,000."

26. From the express stipulations of the parties, the pleadings in the case, the creditors' proofs of claims (admitted into the record), and the Chapter 13 Statement in the to prior bankruptcies involving the Debtor (also admitted into evidence), we deduce that the following claims, secured by the Premises, existed as of the date of the Debtor's present bankruptcy filing, in the following priority:

1. City of Philadelphia $ 2,190.77
2. Mid–Penn 1,600.00
3. 1st Mutual 14,758.16

---

**4.** On the latter occasion, the Debtor claimed that Mona had removed about half of the funds from the HUD/Berean loan from a bank account without his authority or knowledge.

| | | |
|---|---|---|
| 4. | Goldome | $ 8,711.17[5] |
| 5. | HUD | 19,168.77 |
| | TOTAL | $46,428.87 |

## C. CONCLUSIONS OF LAW

### 1. THIS COURT HAS JURISDICTION TO HEAR AND DETERMINE THIS PROCEEDING

Although the Debtor's one-and-a-half-page, bare-bones Complaint fails to include the requisite averments that we have jurisdiction to hear this matter and that it is a core proceeding, as required by B.Rule 7008(a), we easily conclude that this is the case, as this proceeding falls squarely within the scope of 28 U.S.C. § 157(b)(2)(K). No party appears to contest our power to hear and determine this matter pursuant to 28 U.S.C. § 157(b)(1). We shall therefore proceed to do so.

### 2. DISCHARGEABILITY OF THE DEBTOR'S OBLIGATIONS TO ANY OF THE DEFENDANTS IS NOT IN ISSUE, NOR WOULD IT BE APPROPRIATE TO DETERMINE THIS ISSUE AT THIS JUNCTURE

Pervading this proceeding is the suggestion that the parties, particularly the Debtor and his counsel, misunderstood the nature of this proceeding. The Complaint, though bare-bones, appropriately seeks that we determine the priority and extent of the Defendant's liens against the Premises and invokes 11 U.S.C. § 506(a), which reads as follows:

> § 506. Determination of secured status
>
> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use on a plan affecting such creditor's interest.

In their respective Answers, both Goldome and 1st Mutual pleaded Counterclaims asserting that, due to the alleged fraudulent misrepresentations to them by the Debtor of the title of the Premises at the time of his making loans from them, the Debtor's indebtedness to them should be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2). In a colloquy with counsel representing these parties prior to commencement of the trial, we hoped that we had dispelled any misimpressions that we considered the dischargeability of the debts of any of the Defendants to be in issue. Since 11 U.S.C. § 1328(a) provides that a Chapter 13 debtor may discharge any debt which might be nondischargeable under § 523(a)(2), *see, e.g., In re Johnson–Allen,* 871 F.2d 421, 428 (3d Cir.1989); *Johnson v. Edinboro State College,* 728 F.2d 163, 166 n. 4 (3d Cir.1984); 3 COLLIER ON BANKRUPTCY, ¶ 523.03, at 523–9 to 523–11 (15th ed.1989); and 6 COLLIER, *supra,* ¶ 1328.01[1][c], at 1328–3 to 1328–5, there would appear to be no question that § 523(a)(2) could not be invoked by any of the Debtor's creditors. At the very least, such issues would not be ripe for determination at this time. *See Johnson–Allen, supra,* 871 F.2d at 423–24;

---

**5.** This is the most difficult and significant of the claims to assess. The sum recited here is the lowest possible amount of this claim, but it is the amount which Goldome itself appears to claim in its Answer to the Complaint. However, the Debtor's Chapter 13 Statement places the amount owed at $13,100. If the $13,100 figure were accurate, the sum of the security interests against the property would be $50,817.20, and a small portion of HUD's secured claim might be subjection to reduction, even if

we find, as we do at pages 289–92 *infra,* that the Debtor is estopped from contending that he and Mona are not the full owners of the Premises. However, in a § 506(a) proceeding, the Debtor definitely has the burden of proving that the secured claims exceed the value of the property secured. Not having proven that the total of the secured claims exceeded $50,000, the Debtor will not be permitted to invoke § 506(a) here.

and *In re Heincy,* 858 F.2d 548, 550 (9th Cir.1988).

Nevertheless, the Debtor's counsel presented us with a Brief entitled "Plaintiffs [sic] Brief in Support of Dischargability [sic] re Equitable Estoppel" (hereinafter referred to as the "Debtor's Brief"). Somehow the Debtor's counsel apparently misunderstood our statements, at the close of the trial, indicating that we considered whether the Debtor's actions estopped him from successfully invoking § 506(a) as reopening the issue of dischargeability, which we thought that we had lain to rest in our comments at the outset of the trial. Thus, we find the Debtor arguing to us that his debts to the Defendants are not nondischargeable, thereby misconstruing our statements as raising "the issue as to whether the doctrine of equitable estoppel could be used to prevent the discharge of this [sic] debt." Debtor's Brief, at 1.

Thus, we find it necessary to reiterate at the outset that dischargeability of the Debtor's obligations to any of the Defendants here is *not* in issue. The only issue presented is whether the Debtor may successfully invoke § 506(a) to fix the amounts of any of the Defendants' valid liens against the Premises at less than the face amounts of the debts owing to them. It is in this context alone that we believe that estoppel is relevant.

3. THE DEBTOR COULD POTENTIALLY REDUCE THE DEFENDANTS' SECURED CLAIMS BY THE PERCENTAGE OF HIS INTEREST IN THE PREMISES IN RELATION TO HIS SIBLINGS, BUT NOT IN RELATION TO THE TENANCY OF THE ENTIRETIES WHICH HE HOLDS THEREIN WITH HIS WIFE

■ Our previous decision in *In re Crompton,* 68 B.R. 831, 834–35 (Bankr.E.D.Pa.1987), following the decision of former Chief Judge Emil F. Goldhaber of this court in *In re Whitener,* 63 B.R. 701 (Bankr.E.D.Pa.1986), establishes that, but for the intervention of the element of estoppel, the Debtor here would be able to utilize § 506(a) to obtain a determination that the interest of his estate in the Premises is only three thirteenths (³⁄₁₃) of the total value of the Premises. The ten other issue of Lula who survived her (and, in the case of those who died after her, their prolific issue) and did not execute the deed of September 17, 1984, each continue to share a one-thirteenth (¹⁄₁₃) interest in a tenancy-in-common with the Debtor and his wife. Since a tenancy-in-common is a divisible estate, we would, at least in instances where no element such as estoppel is raised, ascertain the portion of the interest of the estate in the Premises in performing a § 506(a) calculation.

However, the Debtor's estate in the Premises held by the entireties with Mona cannot be so divided. *See Jablonski, supra,* 70 B.R. at 387–88, *aff'd,* 88 B.R. at 656. *Accord, In re Panas,* 68 B.R. 421, 424–25 (Bankr.E.D.Pa.1986) (per GOLDHABER, CH. J.). Therefore, the Debtor cannot make use of Mona's co-ownership of the Premises as a factor in the § 506(a) valuation process, as she is still married to him.[6]

4. THE DEBTOR IS BARRED FROM ASSERTING THE INTEREST OF HIS SIBLINGS IN THE PREMISES BY REASON OF EQUITABLE ESTOPPEL

a. OF THE THREE GENERAL TYPES OF ESTOPPEL, IT IS ONLY EQUITABLE ESTOPPEL, OR ESTOPPEL IN PAIS, WHICH IS IN ISSUE HERE

■ There are three kinds of estoppel (1) by record, (2) by deed, and (3) by matter in pais, or equitable estoppel. 28 AM.JUR.2d 600 (1966); and 14 P.L.E. 170 (1959). Estoppel by record, which precludes a party

6. The Debtor did testify that he was pursuing divorce proceedings against Mona. If the Debtor succeeded in obtaining a divorce from her prior to the date of confirmation of his Chapter 13 plan, which we believe is the proper temporal focus of a § 506(a) proceeding, *see Jablonski, supra,* 88 B.R. at 655–56; *In re Blakey,* 76 B.R. 465, 468–69 (Bankr.E.D.Pa.1987); and *Crompton, supra,* 68 B.R. at 835, reconsideration of our decision here might be in order.

who has made a certain declaration of act in a judicial or legislative proceeding from contending to the contrary, is rather clearly not in issue.[7]

It might appear that, since the declarations in the deed of September 17, 1984, are central to the matters at issue, "estoppel by deed" would be pertinent here. "Estoppel by deed" is a technical legal theory, which allows application of estoppel "without any reference to the moral qualities" of the party seeking to be estopped. 28 AM. JUR.2d, *supra,* at 611–12. However, "estoppel by deed" only applies to an attempt by a party claiming under a deed to assert a right contrary to it or the authority to execute it among parties to the deed itself or their privies, and not, as here, as to judgment creditors. 14 P.L.E., *supra,* at 175–80. Therefore, our focus in the matter at hand is solely upon estoppel in pais or equitable estoppel.

b. WHILE THE ELEMENTS OF EQUITABLE ESTOPPEL INCLUDE A MISREPRESENTATION OF FACT BY THE PARTY SEEKING TO BE ESTOPPED, IT IS NOT NECESSARY TO ESTABLISH ACTUAL INTENTION TO DEFRAUD THE PARTIES SEEKING TO INVOKE ESTOPPEL

■ The most comprehensive statement that we could find regarding the elements of equitable estoppel is the following, appearing at 28 AM.JUR.2d, *supra,* at 640–41:

Broadly speaking, the essential elements of an equitable estoppel or estoppel in pais, as related to the party to be estopped, are (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; and (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or

influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. And, broadly speaking, as related to the party claiming the estoppel, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice (footnotes omitted).

*See also, e.g., Heckler v. Community Health Services of Crawford County,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); *United States v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987); *Santos v. Franklin,* 493 F.Supp. 847, 853 (E.D.Pa. 1980); *GAF Corp. v. Amchem Products, Inc.,* 399 F.Supp. 647, 657–59 (E.D.Pa. 1975), *rev'd on other grounds,* 570 F.2d 457 (3d Cir.1978); *Franks, supra,* 95 B.R. at 353–54; and 14 P.L.E., *supra,* at 189–91.

The Debtor appears to suggest that, since he "did not intentionally misrepresent a fact" in the deed-preparation process on September 17, 1984, Debtor's Brief, at 3, and because the creditors failed to investigate the validity of his title, *id.* at 4, the Defendants should not be permitted to successfully estop him here. This appears to call into question the first of the three elements which must be established as to the party sought to be estopped. There seems little question of the other elements; the Debtor expected the creditors to rely upon the deed, and he had actual knowledge of the potential interest of his siblings and their issue in the Premises. He also appears to question whether the first of the three elements relating to the parties claiming estoppel is met, *i.e.,* whether they had the "means of knowledge of the truth" of the defects in the Debtor's title. Clear-

---

7. The only contention that could be made in this regard would be in reference to the recitations made by the Debtor in the Chapter 13 Statements filed in this bankruptcy and the Debtor's prior case that he and Mona alone owned the property. We are, however, reluctant to apply this type of estoppel to bankruptcy schedules, which are the direct workproduct of counsel and are not a first-hand declaration of the sort we believe should be necessary to allow invocation of "estoppel by record."

ly, the other elements are satisfied; they did rely on the deed and would have done so to their detriment if § 506(a) is able to be invoked against them.

If necessary, we might well have concluded that the misrepresentations by the Debtor in issue here were intentional, given a very close question as to whether the Debtor's conduct in inducing Magid to prepare the deed of September 17, 1948, including the false recitals that the parties executing same were the only heirs of Lula having a possible legal interest in the Premises, was in fact *calculated* by the Debtor. However, we do not think that such a harsh conclusion is necessary to our result. We need not find that the Debtor "had an actual intent to deceive, defraud, or mislead," that he was "motivated by actual malice," or that he intended to influence the creditors to allow invocation of equitable estoppel against him. 28 AM. JUR.2d, *supra*, at 648. *Accord*, 14 P.L.E., *supra*, at 190. Rather, in order to bring equitable estoppel into play, it is only necessary that we find that he "intended, or at least expected, that his conduct on which it is sought to predicate his estoppel should be acted upon by the other party or by other persons." 28 AM.JUR.2d, *supra*, at 647. *Accord*, 14 P.L.E., *supra*, at 191.

Thus, in *Kirk v. Hartman & Co.*, 63 Pa. 97, 106 (1870), the Pennsylvania Supreme Court, over a century ago, stated that "all estoppels shut the mouth of the party because it would be a fraud in him to speak, whether his original act or declaration was intended to deceive or not." While it is true that acts or conduct as consistent with an honest purpose as its opposite do not provide a basis for estoppel, *In re Estate of Tallarico*, 425 Pa. 280, 288–89, 228 A.2d 736,747 (1967); and *Northwestern Nat'l Bank v. Commonwealth*, 345 Pa. 192, 197, 27 A.2d 20, 23 (1942), if an act or failure to act "becomes a fraud," *Hill v. Epley*, 31 Pa. 331, 334 (1858), "the intention to relinquish a right need not be present." *Brown v. City of Pittsburgh*, 409 Pa. 357, 361 n. 3, 186 A.2d 399, 402 n. 3 (1962).

c. EQUITABLE ESTOPPEL MAY BE SUCCESSFULLY INVOKED AGAINST THE DEBTOR BY THE DEFENDANTS

We concluded, at Finding of Fact 21, page 287 *supra*, that, since his contrary contentions were unsupported by even his brother, the Debtor did supply Magid with the inaccurate recitations in the deed regarding the heirs of his mother. The Debtor must have known that these recitations were significant, in light of the failed attempt at circulating the "round-robin letter" to his siblings. He also knew or should have known that these representations would be acted upon by Magid in drawing up the deed. Magid had no connection with any of the financing transactions and hence lacked any incentive for deviation from his regular practice of preparing only such deeds as he knew were not erroneously misleading. Thus, in Finding of Fact 21, page 287 *supra*, we discounted any fraud or gross negligence on the part of Magid. Magid would have prepared the deed as he did only upon the making of express misrepresentations to him by the Debtor. These misrepresentations were knowingly and actively made by the Debtor. That the Debtor may or may not have contemplated the total significance of these misrepresentations in the role of his later loans is, we believe, irrelevant.

We note that, although "estoppel by deed" is inapplicable, equitable estoppel is properly applied against a party who, being able to read and comprehend a legal document, accepts the erroneous document and utilizes it for his own benefit. Thus, in *Yohe v. Yohe*, 466 Pa. 405, 410, 353 A.2d 417, 420 (1976), the respect for "[t]he integrity of signed documents ... in land transactions" is recited as a basis for ruling against an attack on a deed by a husband who claimed, with apparent credibility, that he did not mean to sign, as he did, a deed conveying a property entirely to his wife. *See* 28 AM.JUR.2d, *supra*, at 691–93. The Debtor is far from illiterate, and was certainly capable of observing and correcting the prominent erroneous recitation on the

first page of the deed of September 17, 1984, that his mother died, leaving only three rather than 13 surviving issue. He must have known, in light of the failed attempt to circulate the "round-robin" letter, that he could not obtain a deed which he could use as a basis for borrowing unless all of his siblings joined in permitting him to do so. His failure to obtain their joinder or correct the obviously erroneous recitals in the deed, even if we believe his doubtful statement that he was not the very source of these inaccurate recitals, was, at the least, reckless or grossly negligent.

The application of estoppel against the Debtor here is similar to that worked in *In re Solomon*, 40 F.Supp. 62, 63–65 (E.D.Pa. 1941). There, mortgagees of a premises sought correction of a defect in a mortgage signed by a husband who was alone during a time when the premises was owned by him and his wife by the entireties. The court reversed a judgment by the bankruptcy court allowing the correction, holding that, since the mortgagees were claiming under the mortgage, they could not alter its contents. So here, the Debtor asserted his title to the premises in his dealings with the Defendants on the strength of title arising from the deed of September 17, 1984. Therefore, he should not, at this juncture, be heard to contest that very deed's accuracy.

We also agree, with HUD, that the reasoning of *Puharic v. Novy*, 317 Pa. 199, 204, 176 A. 233, 234 (1934), is a convincing rebuttal to the Debtor's argument that the Defendants had a duty to look behind the deed of September 17, 1984, to ascertain the defects in the deed. There was absolutely nothing presented to the Defendants, on the face of the deed or otherwise, which would or should have caused them to have questioned the validity of the deed or its recitals. The Defendants had no knowledge which could cause them to question the accuracy of the recital in the deed that Lula had but three children. The deed was regular and totally valid on its face. We decline to credit the Debtor's contentions that he told anybody about the potential claims of his siblings in the title of the Premises prior to instituting this proceeding. The Debtor has completely failed to convince us that he told several parties, including his competent former bankruptcy counsel as well as agents of the Defendants, that his mother had other heirs not named or included in the deed. Therefore, we do not accept the argument that his statements to agents of the Defendants "counter-estopped" the Defendants from contending that they thought that the restitutions of the deed were accurate.

We therefore conclude that equitable estoppel constitutes a valid defense of the Defendants to the proceeding in issue.

d. INVOCATION OF EQUITABLE ESTOPPEL AGAINST THE DEBTOR HERE IS IN NO SENSE UNJUST OR IMPROPER

In two prior decisions, *In re Taylor, Taylor v. Federal Nat'l Mortgage Ass'n*, 96 B.R. 584, 591–93 (Bankr.E.D.Pa.1989); and *In re Mays*, 85 B.R. 955, 962–64 (Bankr.E.D.Pa.1988), *aff'd*, C.A. No. 88–4306, 1988 WL 81716 (E.D.Pa. August 1, 1988), we have suggested that equitable considerations are relevant to a determination as to whether 11 U.S.C. § 506(a) may be invoked by a debtor. The application of equitable considerations here would bar the Debtor's use of § 506(a), because it would be offensively inequitable to allow the Debtor here to successfully invoke § 506(a). However, we note that we do not reach our result here on this basis. Rather, here, we are ruling that the Debtor is legally estopped from denying that he and Mona are full owners of the Premises as to Defendants Mid–Penn, 1st Mutual, Goldome, and HUD. This conclusion does not flow only from the purely equitable determination that it would be unfair to allow this Debtor to use this Code provisions against these parties.

5. THE DEBTOR IS NOT ENTITLED TO ANY RELIEF UNDER 11 U.S.C. § 506(a)

The interests of the Defendants in the interest of the Debtor's estate in the Premises are, therefore, entitled to extend to the full value of the Premises, *i.e.*, "at least

$50,000." The Debtor has not proven that the interests of any of the Defendants, even HUD, occupying the rump position, exceed the $50,000 mark at this juncture. *But see* Finding of Fact 26, pages 287–88 & n. 5 *supra;* and page 289 n. 6, *supra.* Therefore, the Debtor is not entitled to any relief under 11 U.S.C. § 506(a), and the proceeding must be dismissed.

## D. CONCLUSION

An order consistent with the conclusions reached in this Opinion will be entered.

## ORDER

AND NOW, this 24th day of April, 1989, after trial of the above adversary proceeding on January 26, 1989, and review of the post-trial Briefs submitted by the parties, it is hereby ORDERED as follows:

1. Judgment is entered in favor of the Defendants, FIRST MUTUAL CORPORATION, GOLDOME CREDIT CORPORATION, SECRETARY OF UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, MID–PENN CONSUMER DISCOUNT COMPANY, and CITY OF PHILADELPHIA, and against the Plaintiff and Debtor, LOWELL WEBB.

2. No relief is accorded to the Debtor pursuant to 11 U.S.C. § 506(a) herein, and the Complaint of the Debtor is therefore DISMISSED.