In re STREAMLIGHT, INC., Debtor.

STREAMLIGHT, INC., Plaintiff,

v.

INTERNATIONAL HEALTH AND SAFETY CORP.

and

HMR World Enterprises, Inc.

and

New PX Imaging, Inc., Defendants.

Bankruptcy No. 89–10602S.
Adv. No. 89–0677S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 15, 1989.

Patrick J. Casey, Philadelphia, Pa., for debtor.

Harvey A. Sernovitz, Philadelphia, Pa., for HMR World Enterprises, Inc.

Robert Szwajkos, Philadelphia, Pa., for Creditors' Committee.

Paul S. Aufrichtig, New York City, for HMR World Enterprises, Inc.

James E. O'Neill, Dean S. Schwartz, Philadelphia, Pa., for New PX Imaging, Inc.

## ADJUDICATION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. FINDINGS OF FACT

1. On February 13, 1989, the Debtor–Plaintiff STREAMLIGHT, INC. (hereinafter "the Debtor"), filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code in this court.

2. On July 14, 1989, the Complaint in the instant adversary proceeding was filed against Defendants INTERNATIONAL HEALTH AND SAFETY CORP. (hereinafter "IHS"), HMR WORLD ENTERPRISES, INC. (hereinafter "HMR"), NEW PX IMAGING, INC. (hereinafter "PX"), and RESCUE MED or RES–Q–MED (hereinafter "RQM"), seeking recovery of an unpaid account receivable alleged to be in the amount of $6,792.20.

3. On or about September 18, 1989, this court entered a default judgment against IHS.[1] On September 18, 1989, and October 5, 1989, PX and RQM filed motions to dismiss them from the Complaint as defendants, alleging that PX had no contract with the Debtor and that RQM was merely a trade name of PX. We denied these motions, since it was not clear that the Plaintiff could prove no set of facts which would render PX liable to it, and these pleadings required us to look beyond the allegations of the Complaint and we saw no basis to treat the motion as a motion for summary judgment. *See, e.g., In re Dinkins*, 79 B.R. 253, 256 (Bankr.E.D.Pa.1987); 2A J. MOORE, FEDERAL PRACTICE, ¶ 12.09, at 12–73 to 12–85 (2d ed.1989). The matter, having been continued twice, was then listed for trial on a must-be-tried based on November 8, 1989.

4. In the course of the trial, all parties consented to the dismissal of the claim against RQM, and Debtor agreed to limit its request for damages against PX only to $4,852.05.

---

1. Although we have a very clear recollection of signing this Order, it is neither noted on the docket nor among the file papers which we can locate. If it becomes important to the Debtor to do so, we invite it to submit a new form of order granting relief against IHS, so that this may be properly noted on the docket and in the case record.

5. At the close of the trial, the court also permitted the Debtor, who had alleged in its Complaint that it had delivered the goods in issue on which the balance was $6,792.20 to "the Defendants," to amend the Complaint to conform to its evidence that PX was liable as a transferee of the goods in issue and that HMR was liable due to its corporate relationship with IHS. We believed that the liberality of allowing amendments to pleadings pursuant to Bankruptcy Rule 7015 and Federal Rule of Civil Procedure 15(b) justified this request, over the objections of PX and HMR.

6. The Debtor's President, George C. Collier III, credibly testified at trial that (a) In August, 1988, it shipped goods to IHS valued at $7,292.20; and (b) The only payment received therefor was $500 in October, 1988, leaving a $6,792.20 balance.

7. By means of discovery apparently taken just prior to trial, the Debtor learned that, pursuant to an Agreement dated January 19, 1989, recited to be between PX, a subsidiary of Numedco Co., as buyer, and IHS, a subsidiary of HMR, as seller, IHS transferred its customer list, catalogs, financial supporting data, and all of its inventory (the inventory was valued at eighty-five (85%) percent of cost) to PX. In addition, the Agreement provided, *inter alia*, that (a) PX assumed a list of IHS's liabilities to "key vendors," which did not include the Debtor; (b) PX would collect IHS's receivables in consideration for a fifteen (15%) percent management fee; (c) PX would conduct all of the operations IHS thereafter; and (d) HMR and IHS would indemnify PX on "all matters concerning IHS."

8. The merchandise inventory acquired by PX from IHS included a portion of the exact types, quantities, and prices of certain goods as those sold by the Debtor to IHS, which were valued at a total of $4,852.05.[2] We find that this inventory in fact referenced a substantial portion of the goods shipped to IHS in August, 1988.

9. Mr. Collier produced two communiques which it had previously received from HMR, but apparently only recently recovered from its files, concerning its relationship with IHS:

a. A press release of April 15, 1988, announcing IHS's "merger" with HMR.

b. An apparent form letter sent to all creditors of IHS, on June 16, 1989, advising that HMR, an "investor" in IHS which had tried to "assist" IHS by collecting its accounts receivable and paying its accounts payable, was unable to continue its "assistance" because all of the funds of IHS had been exhausted.

10. Buckley Thompson, the President of PX, also testified at the trial. He admitted that neither PX nor any other party to the January 19, 1989, transaction had given notice of this transaction to any of IHS's creditors. He had no explanation as to why the Debtor was not among the creditors whose liability PX had assumed, having recognized the product valued at $4,852.05 as manufactured by the Debtor. However, he did not indicate whether this product or any of the inventory or other property purchased by PX from IHS had been re-sold or was still in PX's possession. Finally, he stated that, to the best of his knowledge, HMR was an "investor" in IHS, and that IHS had been operated by HMR and an individual or individuals surnamed McLellan.

## B. CONCLUSIONS OF LAW

1. *This court will hear and determine this proceeding.*

This court clearly has jurisdiction to hear this proceeding under 28 U.S.C. § 1334(b). Although there is some question as to whether this proceeding presented sufficiently straightforward facts and claims that it could be considered a "garden-variety" accounts receivable action and hence was a core proceeding, *compare In re Windsor Communications, Inc.*, 67 B.R. 692, 700 (Bankr.E.D.Pa.1986), *with In re*

---

**2.** This revelation motivated the Debtor's agreement to reduce its claim against PX to this amount. *See* Finding of Fact 4, page 506 *supra.*

*A.I.A. Industries, Inc.*, 75 B.R. 1013, 1017–20 (Bankr.E.D.Pa.1987), the parties all expressly consented to this court's determining it. *See* 28 U.S.C. § 157(c)(2).

2. *The parties apparently agree that the instant proceeding is governed by the law of New York.*

IHS and HMR were based in New York and hence the goods sold in issue were shipped to New York; and the all-important Agreement of January 19, 1989, was apparently made and effected in New York. We will accept the apparent stipulation of the parties as to the choice of law. *See In re Fleet,* 95 B.R. 319, 323 n. 1 (E.D.Pa.1989); and *In re DSC Industries, Inc.,* 79 B.R. 244, 247 (Bankr.E.D.Pa.1987), *aff'd in part [as to the choice of law issue] and remanded in part,* 94 B.R. 42, 44–45 (E.D.Pa.1988).

3. *The Debtor has failed to meet its burden of proving, by a preponderance of the evidence, that HMR is liable for the obligation of IHS to the Debtor.*

The theory advanced by the Debtor to render HMR, as well as IHS, against whom it already has a judgment, liable to it is based on the contention that IHS merged with HMR, which is in turn based solely upon the contents of the press release of April 15, 1988. Under New York law, the corporation surviving a merger "shall assume and be liable for all the liabilities, obligations and penalties of each of the constituent corporations." N.Y.BUS. CORP.LAW, § 906(b)(3) (McKinney 1986).

■ The difficulty with this argument is that it has not been proven, by the force of any evidence entitled to substantial weight, that IHS and HMR did, in fact, accomplish a "merger," in the legal sense of the term, irrespective of the terms of the press release. The press release is not a legal document and is not the sort of document the contents of which we would be inclined to put great confidence.[3]

The only document of any legal import which recites the relationship between IHS and HMR is the Agreement of January 19, 1989,[4] which recites that IHS is a "subsidiary" of HMR. As the text of that document clearly implies, IHS is an entity separate and apart from HMR, since IHS's assets are being sold to PX, while HMR presumably remains a separate, viable entity. We have no indication that the Agreement was in any way drafted with any self-serving intention of the parties in mind to exonerate HMR from liability which would otherwise attach to it. We are therefore prepared to accept the recitals therein as far more likely to be accurate than the contents of the press release.

We also note that the status of the relationship of HMR and IHS as parent corporation and subsidiary, respectively, is consistent with both the form letter sent to the creditors of IHS on June 16, 1989, and the testimony of Mr. Thompson. While we could easily dismiss the letter as self-serving, we cannot dismiss the testimony of Mr. Thompson on this basis. If HMR were found liable in this action, it would benefit PX, as a party liable with it jointly and severally. Testimony of Mr. Thompson that exonerates HMR is, therefore, contrary to PX's financial interests.

■ Our factual conclusion that the relation of HMR and IHS was that of parent and subsidiary resolves the legal issue of the liability of HMR to the Debtor for the indebtedness of IHS to the Debtor. Pursuant to applicable New York law, HMR, as IHS's parent corporation, is not liable for IHS's debts. A parent corporation is treated as merely a shareholder of a subsidiary.

For most purposes, the law deals with a corporation as an entity distinct from its shareholders. Traditionally courts will pierce the corporate veil "when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime." *United States v. Milwaukee Refrigerator Tran-*

---

3. Witness the "occasional" inaccuracy of newspaper stories.

4. Although we must confess that, having reviewed the terminology of this document, we doubt that it was the handiwork of an attorney.

sit Co., C.C.E.D.Wis.1905, 142 F. 247, 255; *In re Belt–Modes, Inc.*, D.C.S.D.N.Y.1950, 88 F.Supp. 141; *Rapid Transit Subway Construction Co. v. City of New York*, 1932, 259 N.Y. 472, 182 N.E. 145.

*In re Gilbralter Amusements, Ltd.*, 291 F.2d 22, 24 (2d Cir.1961). *Accord, e.g., Puma Industrial Consulting, Inc. v. Daal Associates, Inc.*, 808 F.2d 982, 986 (2d Cir. 1987); *New York State Teamster Conf. Pension & Retirement Fund v. Hoh*, 554 F.Supp. 519, 525–26 (N.D.N.Y.1982); and *Cammarata v. Ice Cream Drivers & Employees Union, Local 757*, 441 F.Supp. 696, 698 n. 1 (E.D.N.Y.1977), *aff'd*, 591 F.2d 1329 (2d Cir.1978). *Cf. Parker v. Bell Asbestos Mines, Ltd.*, 607 F.Supp. 1397, 1399 (E.D.Pa.1985) (applying Pennsylvania law).

■ There is no evidence of any action by HMR which would, in our view, rise to the level of justifying a wrong, protecting fraud, or defending as crime, the only exemptions recited in *Gibralter Amusements* to the rule that a parent is not liable for a subsidiary's obligations and that the subsidiary's corporate veil may not be pierced to render its parent liable for its obligations. The dispatch of the press release of April 15, 1988, although potentially misleading, does not rise to the level of a "wrong" or fraudulent act. There is no evidence that the Debtor was misled in its dealing with IHS by the press release, as would be required to estop HMR from denying that IHS merged with it. *Compare Schifalacqua v. CNA Insurance*, 567 F.2d 1255, 1258 (3d Cir.1977); *In re Webb*, 99 B.R. 283, 290 (Bankr.E.D.Pa.1989); and *In re Temp–Way Corp.*, 82 B.R. 747, 752 (Bankr.E.D.Pa.1988).

■ The violation of the Bulk Transfer Law in the transaction of January 19, 1989, *see* pages 509–10 *infra*, was a "wrong," but not a wrong sufficiently related to the relationship between IHS and HMR as to justify an effective piercing of IHS's corporate veil. Under the terms of the Agreement of January 19, 1989, HMR, as well as IHS, agreed to indemnify PX on any matters concerning IHS. This provision of the Agreement does not evince an attempt by HMR to improperly evade legal responsibil-

ity, but rather indicates a willingness to accept same.

■ In a burst of sentiment which suggests to us that the Debtor recognizes that HMR has no legal liability to the Debtor, the Debtor attempts to invoke 11 U.S.C. § 105(a), and the equitable powers which that Code section bestows on this court, as a means of attaching liability to HMR. However, we have previously

> made it clear that § 105(a) cannot be utilized "as a justification for our proceeding to take otherwise doubtfully authorized judicial actions," *In re Telephonics, Inc.*, 85 B.R. 312, 318 (Bankr.E.D.Pa.1988), or " 'as a loose cannon . . . to support otherwise insupportable claims.' " *In re University Medical Center*, 82 B.R. 754, 758 (Bankr.E.D.Pa. 1988) (quoting *In re Latimer*, 82 B.R. 354, 364 (Bankr.E.D.Pa.1988)).

*In re Amatex Corp.*, 97 B.R. 220, 225 (Bankr.E.D.Pa.), *aff'd sub nom. Amatex Corp. v. Stonewall Insurance Co.*, 102 B.R. 411 (E.D.Pa.1989). *Accord, e.g., In re Morristown & E. R.R.*, 885 F.2d 98, 100 (3d Cir.1989). We thus cannot agree that § 105(a) may serve as a basis for rendering HMR liable in the face of a lack of a legal basis for such liability.

Therefore, we are prepared to enter judgment in favor of HMR as to the Debtor's claim against it.

4.  *The Debtor has established that the Bulk Transfer Law, as articulated in Article 6 of the Uniform Commercial Code (hereinafter "UCC"), was violated in the transaction of January 19, 1989. However, given the uncertainty on the record of the present status of the goods sold by the Debtor to IHS which were delivered to PX in that transaction, we are only empowered to set aside the transfer of the property of IHS to PX, impose a trust for same upon PX, direct PX to provide an accounting of same, and schedule a further hearing on the issue of appropriate relief if the parties are unable to resolve this issue.*

■ There is little question in our mind, despite PX's attempt to dispute the

point, that the transaction memorialized in the January 19, 1989, Agreement was a "bulk transfer." That term is defined, in N.Y.UNIFORM COMM.CODE, § 6–102(1) (McKinney 1964) (hereinafter cited as "the UCC"), as including

> any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies, merchandise or other inventory (Section 9–109) of an enterprise subject to this Article.

Clearly, the transaction with PX was not in the ordinary course of IHS's business as a distributor of industrial health care products. It was a transfer of *all* of the materials, supplies, merchandise, *and* inventory (note that the statute is disjunctive) owned by IHS to PX. It was, moreover, a transfer of all of IHS's assets to PX, which effectively placed all of IHS's operations into the hands of PX. While a transaction may be "bulk transfer" even if it is not a sale of all of a business's assets, certainly a transaction which *is* a sale of all of a business's assets *must* be included with the definition of a "bulk transfer."

■ That the notice required by §§ 6–105 and 6–107 of the UCC was not provided to creditors of IHS, and, in particular, the Debtor, is undisputed. Therefore, the Debtor is entitled to the remedies made available to it in Article 6 of the UCC against PX, the bulk sale transferee who failed to give notice to the Debtor, a creditor of the bulk sale transferor.

Unfortunately for the Debtor, the remedies of a creditor against an errant bulk sale transferee are, under New York law, somewhat unclear. What is clear is that the bulk transfer "is ineffective" as to the Debtor. UCC, § 6–105. As a court of equity rather than merely a court of law, we can provide the Debtor with the relief of declaring the transfer invalid as to it. *Compare H.L.C. Imports Corp. v. M & L Siegel, Inc.*, 98 Misc.2d 179, 413 N.Y.S.2d 605 (Civ.Ct.N.Y.Co.1979) (court of law cannot grant any equitable relief against a bulk sale transferee). The effect of declaring the transfer ineffective is to hold the goods transferred to be, as to the Debtor, considered to be the property of IHS. The Debtor already has a judgment which is unlikely to be satisfied against IHS. However, this relief will provide the Debtor with property against which it can execute upon its judgment against IHS, *i.e.*, not only its goods sold to IHS in PX's possession, but presumably *all* of the goods sold to PX by IHS in the January 19, 1989, transaction. However, it is unclear whether PX still has any of these goods in its possession.

What the Debtor specifically requests is a judgment against PX in the amount of $4,852.05, the declared value of its product which PX received from IHS in the January 19, 1989, transaction. While the "full" version of the UCC adopted in Pennsylvania, including § 6–106, see 13 Pa.C.S. § 6106(1), would appear to allow a creditor to obtain such a remedy, New York has not enacted § 6–106.

In light of the express refusal of New York to adopt the portion of the UCC including this remedy, we are reluctant to write its provision into New York law. We further note that New York has enacted part of § 6–106 into law. *See* UCC, § 6–112 (transferee liable only for certain taxes owed by transferor). However, this separate, partial enactment of § 6–106 only underscores the refusal of New York to enact § 6–106 in its entirety.

We recognize that there is a split of authority as to whether relief against a transferee may be granted even in a jurisdiction which has not enacted § 6–106. *See* Annot., *Bulk Transfers: Construction & Effect of UCC Article 6, Dealing with Transfers in Bulk*, 47 A.L.R.3d 1114, 1142–43 (1973). However, the law of New York, restated as follows in *In re Curtina International, Inc.*, 23 B.R. 969, 979 (Bankr.S.D.N.Y.1982), is rather well-established:

> The New York cases interpreting the bulk sales law have held that a transfer in violation of the law obligates the transferee to account to the transferor's creditors for the value of the merchandise transferred. *Starr Piano Company et al. v. Sammak et al.*, 235 N.Y. 566,

139 N.E. 737 (1923); *In re Perman,* 172 App.Div. 14, 157 N.Y.S. 971 (1st Dept. 1916); *In re Pastene & Co., Inc.,* 156 N.Y.S. 524 (Sup.Ct.N.Y.Co.1914). The court in *In re Pastene & Co., supra,* stated the rule as follows (page 525):

> "The failure to comply with the statute renders the sale void, and the purchaser, instead of becoming the owner of the goods sold, on the complaint of any creditor shall be deemed to be, as a matter of law, a trustee for the creditors of the seller. As soon as the action is begun the purchaser is deemed to be a receiver, with the duty to account as trustee to the creditors pro rata for all the property sold to him in violation of the provisions of the statute."

*See also Irving Trust Co. v. Rosenwasser,* 5 F.Supp. 1016 (S.D.N.Y.1934). However, where the goods were resold, or otherwise disposed of, or intermingled with other merchandise of the transferee in such manner that the goods cannot be identified, the transferee, under such circumstances, will be liable to the creditors to the extent of the fair value of· the goods disposed of or converted by the transferee. *Darby v. Ewing's Home Furnishings,* 278 F.Supp. 917 (W.D.Okl. 1967); *Brod ex rel. Potash's Creditors et al. v. Supreme Dress Co.,* 243 App.Div. 622, 276 N.Y.S. 526 (App.Div. 2d Dept. 1935). *See also* 37 *Am.Juris.*2d § 2721, p. 925, 37 C.J.S. § 484, p. 2352, 47 A.L.R.3d p. 1142.

*Accord, e.g., H.L.C. Imports, supra,* 413 N.Y.S.2d at 606; and *Pittsburgh Plate Glass Co. v. Magni–Flood Corp. of America,* 235 N.Y.S.2d 258, 260 (Westchester Co. Sup.Ct.1962).

PX is therefore obliged to hold the goods which it received in the transaction reflected by the Agreement of January 19, 1989, as a trustee of same and account for the present status or disposition of this property. We shall proceed to grant the Debtor declaratory and equitable relief to that extent. However, if and only if the goods transferred to PX have all been resold, disposed of, or commingled with other merchandise could we direct PX to compensate the Debtor monetarily, by paying it the fair value of the goods in issue. *See Irving Trust Co. v. Rosenwasser,* 5 F.Supp. 1016, 1018 (S.D.N.Y.1934); and *Curtina, supra,* 23 B.R. at 979–81.

The Debtor argues at some length in its post-trial submissions,[5] that, by invocation of 11 U.S.C. § 105(a), we should punish PX's alleged fraud arising from participation in a transaction violative of the Bulk Transfer Law by awarding the Debtor the full sum which it seeks, representing the value of the Debtor's product received from IHS. It appears to us that the relief provided in our Order, which may make it possible for the Debtor to collect its entire judgment against IHS, is more complete than recovery of only $4,852.05 from PX. Furthermore, we find PX to be, if anything, less culpable than HMR, and less of an appropriate target for extraordinary equitably-based relief. Therefore, the analysis of the factual and legal impediments to the Debtor's request for relief under § 105(a) against HMR, set forth at pages 509–10 *supra,* is incorporated hereby by reference.

---

5. The Debtor's counsel has remitted rather excessive post-trial submissions, given the modest value of the case. Forty-one (41) paragraphs of proposed findings of fact and fifty-two (52) paragraphs of proposed conclusions of law, covering sixteen (16) pages, have been submitted, *plus* a 21–page Brief. We do note that thirty-one (31) paragraphs of the proposed findings of fact are reproduced verbatim as proposed conclusions of law, an error which magnifies the length of the materials presented. However, the bulk is still substantial. The Debtor's counsel must be expected to use billing judgment in requesting compensation for services from the Debtor's estate in light of this apparent attempt at overkill. *See In re Central Ice Cream Co.,* 841 F.2d 732, 734–75 (7th Cir.1988); and *In re McLaughlin,* 96 B.R. 554, 563 (Bankr.E.D.Pa. 1989), *aff'd,* C.A. Nos. 89–2279, 89–3672, 89–3748 (E.D.Pa. Sept. 18, 1989).

The Defendants, taking to the other extreme, have submitted no proposed findings of fact nor conclusions of law, as requested in our Order of November 9, 1989, scheduling post-trial submissions. HMR's counsel has used the marginally-acceptable form of submitting a letter-brief addressed to the court to present his arguments.

We are therefore obliged to enter an Order declaring that the sale of goods by IHS to PX is voided as to the Debtor; that PX is a trustee of the property transferred to it by IHS in the transaction of January 19, 1989; and that PX is required to account to the Debtor for the disposition of this property. We urge the parties to avoid additions to the over-expenditure of time on this matter, given its relatively low dollar-value, and to attempt to devise a practical means by which PX can compensate the Debtor for what is due to it, as expressed in this Opinion. We have, however, scheduled a further hearing to resolve the matter totally if the parties are unable to attain such a resolution.

## C. ORDER

AND NOW, this 15th day of December, 1989, after a trial of this proceeding on November 8, 1989, and upon consideration of the proposed findings of fact and conclusions of law and "briefs" submitted by the respective parties, it is hereby ORDERED as follows:

1. Judgment is entered in favor of Defendant HMR WORLD ENTERPRISES, INC. and against the Plaintiff–Debtor, STREAMLIGHT, INC. (hereinafter "the Debtor").

2. Judgment is entered in favor of the Debtor, and against the Defendant, NEW PX IMAGING, INC. (hereinafter "PX"), in part, as indicated in paragraphs 3, 4 and 5 *infra*.

3. The transfer of the property of IHS to PX, reflected in the Agreement of January 19, 1989, is declared ineffective and hence is null and void and of no effect as to the Debtor.

4. PX is declared to be the trustee of all property received from Defendant INTERNATIONAL HEALTH AND SAFETY CORP., in the transaction reflected in the Agreement of January 19, 1989.

5. PX is directed to account to the Debtor, in a writing submitted to the Debtor and to the court in chambers on or before December 29, 1989, as to the disposition of all of the property received by it in the aforementioned transaction reflected by the Agreement of January 19, 1989.

6. While the parties are urged to attain a practical resolution of this controversy consistent with our within Adjudication (thus making the relief provided in paragraph five of this Order moot), in the event that they are unable to do so, a hearing is scheduled to determine any relief to which the Debtor is entitled from PX in light of the said accounting on

WEDNESDAY, JANUARY 17, 1990, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.