## In re INTERSTATE CIGAR CO., INC. and as successor by merger to L.S. Amster & Co., Inc., Debtor.

Committee of Unsecured Creditors of Interstate Cigar Co., Inc. and as successor by merger to L.S. Amster & Co., Inc., Plaintiff,

v.

Interstate Distribution, Inc., and Congress Financial Corporation, Defendants.

Bankruptcy No. 890–81248–478. Adversary No. 890–8249–478.

United States Bankruptcy Court, E.D. New York.

May 16, 2002.

---

Pryor & Mandelup, LLP, by Randolph E. White, Westbury, New York, for the Committee of Unsecured Creditors.

Stewart, Occhipini & Makow, LLP, by Frank S. Occhipini, New York City, for Defendant Congress Financial Corporation.

Parker, Duryee, Rosoff & Haft, P.C., by William M. Rifkin, New York City, for Interstate Distribution, Inc.

Borges Donovan, LLC, by J. Ted Donovan, Syosset, NY, for the Committee of Unsecured Creditors.

## MEMORANDUM DECISION

DOROTHY EISENBERG, Bankruptcy Judge.

This matter is before the Court pursuant to an adversary proceeding commenced on September 6, 1990 by the Committee of Unsecured Creditors of Interstate Cigar Co., Inc. (the "Debtor" or the "Plaintiff"), for the benefit of all creditors of the Debtor, against Interstate Distribution, Inc. ("IDI") and Congress Financial Corporation ("Congress" or the "Defendant"). A portion of the adversary proceeding, in which the Plaintiff sought to hold Congress liable was heard in State Court. A determination has been made in the New York State Appellate Court that found Congress's participation in the transaction at issue violated Article 6 of the Uniform Commercial Code ("Article 6" or the "Bulk Sales Law"). The Court is now called upon to determine the issues raised in the Plaintiff's Motion for Summary Judgment regarding what damages are to be awarded in favor of the Plaintiff. The following constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### FACTS

On March 7, 1990, the Debtor had entered into an Asset Purchase Agreement ("Purchase Agreement") to sell substantially all of the assets of its Health and Beauty Aids division ("Transferred Assets") to IDI. The agreed-upon price for the purchase of the Transferred Assets was $29,154,924.00. (Plaintiff's Exh. F). Schedule 5.1 of the Purchase Agreement sets forth the values for the assets being purchased. The inventory was valued at $13,817,284 and the equipment was valued at $1,103,448. Section 5.1(b) of the Purchase Agreement allows IDI to select the inventory purchased and Section 2.8(b) of the Purchase Agreement sets forth the formula for valuing the inventory selected. The fixed assets were purchased at net book value. As set forth in Schedule 5.1(c) of the Purchase Agreement, the price equaled cost less accrued depreciation.

CIT/Group/Factoring Manufacturers Hanover ("CIT") had a pre-existing, valid, perfected security interest in the Transferred Assets at the time the parties entered into the Purchase Agreement, and was owed approximately $21,658,238.43 by the Debtor at the time of the closing.

As consideration for the Transferred Assets pursuant to the Purchase Agreement, IDI agreed to pay the following:

(i) Payment to CIT in the sum of $18,258,238.43, in exchange for which CIT released its lien on the Transferred Assets;

(ii) Assumption by IDI and payment by IDI of certain selected accounts payable in the amount of $7,383,217;

(iii) Execution by IDI of a promissory note dated March 7, 1990 in the principal sum of $1.8 million, payable to the Debtor in quarterly installments over five years at ten percent interest per annum;

(iv) Assumption by IDI of certain leases of real and personal property and contracts to which the Debtor was a party; and

(v) Issuance of 3,000 shares of Series B convertible preferred stock of IDI to the Debtor.

As of the closing date, CIT, the Debtor's secured creditor, was owed approximately $21,658,238.43 and agreed to release its security interest and liens on the assets transferred in consideration of receipt of a cash payment of $18,250,238.43. The Debtor executed a promissory note to CIT for the balance of the monies due. To secure payment under the note, the Debtor granted CIT a security interest in the Debtor's stock in its subsidiary, Austin Drugs, not in any of the assets being transferred. Following the closing, IDI paid approximately $7 million to certain, but not all, creditors of the Debtor. The remaining creditors of the Debtor received nothing as a result of the sale.

Congress financed IDI's acquisition of the Transferred Assets by wiring $18,250,000 directly to CIT on behalf of IDI as consideration for CIT's release of its security interest in the Transferred Assets. As part of the loan documents, executed simultaneously with the Purchase Agreement, IDI executed both a security agreement (the "Security Agreement") and a second document entitled "Additional Representations, Covenants and Other Terms Supplemental to Accounts Financing Agreement" (the "Supplemental Security Agreement") in favor of Congress. By virtue of these documents, Congress acquired a security interest in the Transferred Assets owned by IDI.

There was no notice of the sale to the Debtor's creditors, and IDI knew of the non-compliance with Article 6 of the New York Uniform Commercial Code (the "Bulk Sales Law"). The Purchase Agreement waived compliance with the bulk sale statutes, and provided that the Debtor would indemnify IDI for any damages arising from litigation under the Bulk Sales Law. Paragraph 2(j) of the Supplemental Security Agreement provided that delivery of the Purchase Agreement was a condition precedent to Congress's financing the transfer between the Debtor and IDI. The Purchase Agreement was assigned to Congress pursuant to the Supplemental Security Agreement, and within the Supplemental Security Agreement IDI assigned to Congress all of its rights with respect to the parties' failure to comply with the bulk sale laws. By virtue of the documents entered into at the closing, Congress acquired a security interest in the Transferred Assets and had knowledge of the agreement between the Debtor and IDI not to comply with the notice requirements under the Bulk Sales Law.

Throughout the course of IDI's existence, Congress applied proceeds from the sale of the collateral to Congress's loan balance, and after liquidating substantially all of the collateral acquired from the Debtor, IDI went out of business in early 1991. By this time, IDI had paid to Congress all of the principal and a portion of the interest totaling at least $19,391,800 on its credit line pursuant to its loan agreement. After operations ceased, IDI auctioned off its remaining assets and paid the proceeds of the sale to Congress. As a result, Congress recovered all of the money it loaned to IDI, together with interest of approximately $1.2 million (exclusive of origination fees). The unsecured creditors of IDI remained unpaid, and likewise, the unsecured creditors of the Debtor were left with claims in excess of approximately $15 million, with no assets of the Debtor remaining to satisfy the claims.

On May 10, 1990, within several months after signing the Purchase Agreement, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against the Debtor, and an Order for relief was subsequently entered. The principals of the

Debtor failed to participate in the case, and the liquidation of this Debtor's estate was placed into the hands of its Creditors' Committee and counsel to the Creditors' Committee.

The Committee originally commenced this adversary proceeding by filing a complaint on September 5, 1990 (the "Bulk Sale Action"). The complaint was amended on September 25, 1990. The complaint names Congress and IDI as defendants, and seeks relief under the following causes of action:

1. Against IDI and Congress:

A determination that the conveyance of the Transferred Assets to IDI, which was financed by Congress, was a bulk transfer subject to avoidance under Article 6, as made applicable by section 544 of the Bankruptcy Code..

2. Against IDI

A determination that the conveyance of the Transferred Assets to IDI violated N.Y. Debtor & Creditor law, as made applicable by section 544 of the Bankruptcy Code.

3. Against IDI

A determination that the conveyance of the Transferred Assets to IDI was a fraudulent transfer pursuant to section 548 of the Bankruptcy Code.

4. Against IDI

Damages for the transfer voided under sections 544 and 548 of the Bankruptcy Code.

5. Against Congress

Damages for the transfer voided under sections 544 and 548 of the Bankruptcy Code.

A parallel action was commenced in State Court with regard to the first cause of action regarding violation of the Bulk Sales Law. This Court agreed to abstain from hearing this portion of the Bulk Sale Action, but reserved jurisdiction to determine the appropriate remedy in the event liability was found against any of the Defendants as to the first cause of action. In the meantime, the action pending in State Court continued, and certain activity took place in this Court. Gerald Herman, Steven Herman, Susan Lefferts and Robert Botwinick (collectively, the "Hermans") entered into negotiations with the Committee over their claim against the Debtor. The Hermans are former minority shareholders and creditors of the Debtor. Collectively, the Hermans hold the largest prepetition claim against the Debtor in the aggregate amount of approximately $8 million, inclusive of interest. The Hermans' claims arose from the settlement of state court litigation against the Debtor, two affiliates of the Debtor and the controlling shareholders of those corporations, the families of Michael and Sidney Spielfogel. The settlement of the state court litigation prior to trial took place over one year prior to the date of the Debtor's involuntary petition. The Committee and the Hermans agreed to compromise the Hermans' claim pursuant to a settlement dated June 23, 1994. Pursuant to the settlement terms, the Hermans agreed to accept fifty percent of all amounts recovered under the Bulk Sale Action in excess of $200,000 and net of attorney's fees incurred in the litigation. In exchange, the Hermans waived any right to a distribution from other monies in the bankruptcy estate.

Prior to obtaining a decision from the State Court on the First Cause of Action, the Committee brought before this Court a motion pursuant to Bankruptcy Rule 9019 seeking to settle the adversary proceeding for receipt of $200,000 from Congress, pur-

suant to a recommendation from a mediator retained in this adversary proceeding. (The "9019 Motion"). The Hermans objected to the settlement proposed by the Committee, and offered to undertake the representation of the Debtor's estate at their own cost and expense. By written decision, this Court denied the 9019 Motion and authorized the Hermans to proceed with the Bulk Sale Action on behalf of the estate, with the Hermans to bear the remaining cost and expense of any litigation. *In re Interstate Cigar Co., Inc.*, 240 B.R. 816 (Bankr.E.D.N.Y.1999).

On June 21, 2000, a decision was rendered by the Supreme Court of the State of New York (per the Hon. Geoffrey J. O'Connell) finding that the transfer in question violated the Bulk Sales Law as the creditors of the Debtor were not given prior notice of the transfer. Congress appealed this decision, and on January 14, 2002, the Appellate Division, Second Department upheld the decision rendered by Hon. Geoffrey J. O'Connell, finding as follows:

> Congress was granted a security interest in the transferred assets upon financing the transaction on behalf of IDI. It later perfected its security interest by filing Uniform Commercial Code financing statements. Accordingly, Congress falls within the Uniform Commercial Code's definition of a purchaser for the purposes of this transaction.... As such, it can be held liable as a purchaser of IDI's assets pursuant to UCC–6110(1). The record reveals that Congress was aware of the terms and conditions of the agreement of sale, wherein the parties agreed to waive compliance with the Uniform Commercial Code article 6. Furthermore, Congress took care to insure that [CIT] agreed not to assert any claim as an unpaid creditor of [the debtor] based upon non-compliance with applicable provisions of the Uniform

Commercial Code article 6. Accordingly, we conclude that Congress was aware of the noncompliance with the Uniform Commercial Code article 6 and therefore took its security interest in the transferred assets subject to the defect created by the non-compliance (UCC 6–110).

On February 14, 2001, the Plaintiff, represented by Pryor & Mandelup, made a motion for summary judgment before this Court on the issue of damages against Congress and IDI, requesting that this Court find that the Defendants are liable to the creditors of the Debtor for the full amount of the claims filed in this case ($14,718,900) plus interest at 9% running from the date of the transfer. On April 27, 2001, Congress filed reply papers in opposition to the motion, and in response, the Plaintiff filed a Reply Memorandum of Law on July 9, 2001, wherein the Plaintiff amended the damage calculation and requested the value of all of the assets transferred in the sum of $29,154,924.00 plus 9% interest, based on Section 544(b) of the Bankruptcy Code.

In deference to the fact that the Plaintiff raised additional issues in its Reply Memorandum of Law regarding the correct amount of damages, Congress was given additional time to respond to the papers and Congress filed its Supplemental Memorandum of Law on October 18, 2001. In its Supplemental Memorandum of Law, Congress asserted that the Plaintiff had completely changed the legal basis for its calculation of damages on its own motion, and as a result, the original motion failed to give Congress proper notice of the "rules and statutory provisions upon which it [was] predicated and the specific legal and factual grounds pursuant to which relief [was] sought," as required by Local Rule 9013–1. Congress requested that the original motion be stricken and that dis-

covery commence on damages. Congress also states that on July 1, 2001 the New York Legislature adopted proposals by the New York State Law Revision Commission and repealed the Bulk Sales Law, and that this motion should be viewed under the prism of this action by the New York Legislature. Additional papers were filed by both parties in February, 2002 regarding various issues raised by the Plaintiff's Motion for Summary Judgment. In addition, the Committee has filed an Affirmation in Support of the Motion for Summary Judgment dated February 22, 2002. The Committee correctly points out that there are still two open issues which are not part of the instant motion for summary judgment: (i) the third cause of action against IDI under Section 548 (and the related fourth cause of action against IDI and second cause of action against Congress under section 550 should the Plaintiff prevail on the third cause of action), and (ii) the objection filed by the Committee to the proof of claim asserted by Congress for indemnification. These matters await hearings and determinations at a later date.

On March 7, 2002, the Court entertained oral argument on the Plaintiff's Motion for Summary Judgment, and thereafter the matter was marked submitted.

### DISCUSSION

#### Procedural Objections

■ Congress alleges that the Motion for Summary Judgment is subject to certain procedural infirmities. First, Congress complains that the Plaintiff did not originally request that the entire transaction be avoided in an amount in excess of $29 million, and amended its original papers too late to seek damages under § 544 of the Bankruptcy Code. Admittedly, the Plaintiff initially sought a finding from the Court that summary judgment should be awarded limited to the amount of the claims filed in this case to date. However, the Court will permit the Plaintiff to amend its Motion for Summary Judgment as to the amount and basis for the damages originally sought in its complaint, as it is the Court's province to do so.

The Court has given Congress ample time over these past months to respond to the supplemental papers filed by the Plaintiff in support of its motion, and Congress is not prejudiced by the amended request for damages. This Court is charged with determining the appropriate legal issues, regardless of the arguments made by the parties. The supplemental papers filed by the Plaintiff clarify and provide the legal basis for the Motion for Summary Judgment, and are welcome in this instance, where the Court is obligated to consider the proper method of determining damages against Congress arising from the bulk sale. In fact, Congress has submitted several additional sets of papers in opposition to the arguments asserted by the Plaintiff regarding the applicability of §§ 544 and 550 of the Bankruptcy Code in determining damages.

■ Second, Congress urges the Court to deny the Motion for Summary Judgment due to the recent repeal of the Bulk Sales Law. However, the transaction in question predated the repeal by over ten years, and although it is an interesting footnote to this case, it has no bearing on this Court's determination of damages against Congress. The Bulk Sales Law was clearly in effect as of the date of the transaction in question, and Congress and IDI were obligated to comply with its notice requirements or suffer the consequences. In addition, another court has already found that Congress violated the Bulk Sales Law, and this Court is precluded from revisiting that issue. The matter

before the Court now is to fix the appropriate damages for such violation.

### Legal Standard for Summary Judgment

The standards by which motions for summary judgment are guided are set forth in Fed.R.Civ.P. 56, in turn made applicable to bankruptcy proceedings through Fed.R.Bankr.P. 7056, which states in part that

> the judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

*See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *In re Pappas,* 239 B.R. 448, 451 (E.D.N.Y.1999).

Summary judgment will be denied where specific facts are adduced indicating a genuine issue for trial. *See generally Celotex Corp. v. Catrett,* 477 U.S. at 322–27, 106 S.Ct. at 2551; *Anderson v. Liberty Lobby Inc.,* 477 U.S. at 247–52, 106 S.Ct. at 2506–11. Summary judgment is appropriate where "no genuine issues of material fact remain for adjudication and the moving party is entitled to judgment as a matter of law." *Flynn v. Hatch,* U.S.Dist. LEXIS 4503 at * 14 (E.D.N.Y.2001) (citations omitted.). Something more than the slightest contestability is required, however; more than just a "metaphysical doubt as to the material facts," or the motion will properly be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *In re Pappas,* 239 B.R. at 452.

The moving party has the burden of showing that no material issues of fact exists with respect to the elements of the claim. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In reviewing a motion for summary judgment, the Court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356. With these standards in mind, the Court turns to the substance of the Plaintiff's motion for summary judgment.

### Calculation of Damages

(a) Entitlement to Money Judgment

 Judge O'Connell concluded that Congress is liable under the Bulk Sales Law as transferee of the inventory and equipment sold to IDI. The Judge's ruling leaves open the issue of whether the Plaintiff's recoveries are limited to an *in rem* action or whether the Plaintiff is entitled to a money judgment. The Bulk Sales Act places a fiduciary obligation on the transferee, with notice of a violation of the Act to hold the assets in trust for the transferor's creditors, thus rendering the transfer ineffective. In the event the obligation is violated and the assets have disappeared or have been commingled, the question of an appropriate remedy arises. Article 6 of the U.C.C. contains an optional section 6–106, which states as follows:

> Upon every bulk transfer subject to this article for which new consideration becomes payable except those made by sale at auction it is the duty of the transferee to assure that such consideration is applied so far as necessary to pay those debts of the transferor which are either shown on the list furnished by the transferor ... or filed in writing in the place stated in the notice ... within

thirty days after the mailing of such notice. This duty of the transferee runs to all the holders of such debts and may be enforced by any of them for the benefit of all.

Only two states ever adopted optional section 6–106 of the U.C.C. New York *did not* adopt this section, but the Bulk Sales Act does not state that a levy on the transferred assets is the only remedy for noncompliance. New York case law provides a basis for awarding a monetary judgment to a plaintiff in a bulk sale action where the transferred assets cannot be levied upon. In *Matter of Curtina Intern., Inc. ("Curtina")*, 23 B.R. 969, 979 (Bankr. S.D.N.Y.1982), the Bankruptcy Court for the Southern District of New York recognized that in such a case, monetary damages would be appropriate:

> [W]here the goods were resold, or otherwise disposed of, or intermingled with other merchandise of the transferee in such a manner that the goods cannot be identified, the transferee, under such circumstances, will be liable to the creditors to the extent of the fair value of the goods disposed of or converted by the transferee. *Darby v. Ewing's Home Furnishings*, 278 F.Supp. 917 (W.D.Okl. 1967); *Brod ex rel. Potash's Creditors, et al. v. Supreme Dress Co.*, 243 A.D. 622, 276 N.Y.S. 526 (2d Dept.1935). See also 37 *Am.Juris.*2d § 272, p. 925; 37 *C.J.S.* § 484, p. 1352; 47 *A.L.R.*3d p. 1142, 1973 WL 33731. Section 550 of the Bankruptcy Code similarly allows the trustee to recover the value of the property transferred. (footnote omitted).

The practice of finding personal liability against the transferee where the goods in question are no longer identifiable has been adopted in other jurisdictions as well. In *Ex Parte Harsco Corp.*, 689 So.2d 845 (Ala.1997), Alabama's highest court overruled the lower court which held that Alabama law precluded a money judgment under Article 6 where the goods are no longer available to satisfy the creditors' claims. The court adopted the "New York Rule" because to hold otherwise would encourage the misconduct the Bulk Sales Law was enacted to prevent:

> The Bulk Transfers Act does not specifically spell out the remedies available to creditors if the Act's notice provisions are not followed; nor does it say that any specific remedy is exclusive. It states only that the transfer of the inventory is "ineffective" against any creditor of the transferor. Section 7–6–104 and 105. Apparently, the creditors are left to whatever form of relief is available by the common law against the inventory that was transferred in violation of the Act. However, an *in rem* action against the inventory is a viable remedy only if the items comprising the transferred inventory are still in the ownership of the transferee and are clearly identifiable among the transferee's possessions. An action *in rem* against the inventory would provide no relief to a transferor's creditors for violation of the Bulk Transfers Act if the inventory has been disposed of by the transferee to another party or has been so commingled with other property of the transferee that it can no longer be identified.

Although the Court of Civil Appeals held in *Get it Kwik [v. First Alabama Bank of Huntsville, N.A.]*, supra, [361 So.2d 568 (Ala.Civ.App.1978)] that a transferee of inventory had no personal liability to a creditor of the transferor, we believe the better—reasoned rule is that a transferee is not personally liable to the transferor's creditors unless the transferred inventory has been disposed of or so commingled that it has been placed beyond the reach of the creditors in an *in rem* action. This rule has been

adopted by the courts in New York and Texas, states where, like Alabama, UCC § 106 was not adopted.... Accordingly, we overrule *Get it Kwik*, to the extent that that opinion holds that where a violation of the notice provisions of the Bulk Transfers Act has occurred, the transferee cannot be personally liable to the transferor's creditors under any circumstances. (Citations omitted).

689 So.2d at 851.

Therefore, the fact that the Transferred Assets are no longer in the possession of Congress does not leave the Plaintiff without a remedy. The appropriate remedy is to award monetary damages to compensate the Plaintiff for Congress' violation of the Bulk Sales Law. The next issue to be resolved is the appropriate calculation of damages to be awarded to the Plaintiff.

### (b). Legal Theory for Calculation of Damages

■ In its original Motion for Summary Judgment, the Plaintiff asserted that the appropriate method for calculating its recovery against Congress was based on the universe of prepetition creditors of the Debtor, or $14,718,000. Thereafter, the Plaintiff correctly noted in its supplemental papers that this adversary proceeding was brought pursuant to § 544(b) of the Bankruptcy Code, and as such, the Plaintiff was entitled to obtain the avoidance of the entire transfer under applicable state law for the benefit of the estate, to be divided pro rata among all creditors of the Debtor equally, subject only to claims of priority or a pre-existing and non-avoidable security interest.

Section 544(b) of the Code states as follows:

[E]xcept as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable under section 502(e) of this title.

Section 544(b) empowers the trustee, or other representative of the bankruptcy estate, to utilize all applicable state law remedies held by a creditor of a debtor at the time of the filing of the case. Section 550(a) of the Code provides that, "to the extent that a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from

(1) the initial transferee of such transfer or the entity for whose benefits such transfer was made; or

(2) any immediate or mediate transfer as such initial transferee."

Section 544(b) of the Code is a codification of the Supreme Court decision *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), and in § 544(b) Congress expressly rejected limiting the estate's recovery to the amounts of particular creditors' claims. In the case of *Moore v. Bay*, the Supreme Court held that the trustee's avoidance of a mortgage, based upon the claims of creditors which predated the mortgage or its recording, rendered the mortgage void as against subsequent creditors as well. The Court found that assets recovered by the trustee are recovered for the benefit of the estate, to be divided pro rata among all creditors equally, subject to claims of priority or a pre-existing and non-avoidable security interest.

Although Congress urges this Court to narrowly read § 544(b) as applicable only to fraudulent conveyances, other courts have permitted the trustee to utilize its strong arm powers under this section to avoid bulk sales. *See Curtina*, 23 B.R.

969, 980 (Bankr.S.D.N.Y.1982); *In re Verco Industries*, 10 B.R. 347 (9th Cir. BAP 1981); and *In re Villa Roel*, 57 B.R. 835 (Bankr.D.D.C.1985). In addition, the Supreme Court in *Moore v. Bay* recognized that the trustee in bankruptcy obtains title to all property which "prior to the petition he could by any means have transferred," presumably without regard to whether the transfer was a fraudulent conveyance. 284 U.S. at 4, 52 S.Ct. 3. In the case *In re Cybergenics Corporation*, 226 F.3d 237, 243–44 (3rd Cir.2000), the Court of Appeals for the Third Circuit recognized that the powers conferred by § 544 of the Bankruptcy Code are for the benefit of all creditors of the debtor:

> The power to avoid the debtor's prepetition transfers and obligations to maximize the bankruptcy estate for the benefit of creditors has been called a 'legal fiction' by one court. It puts the debtor in possession 'in the overshoes' of a creditor. This attribute is no more an asset [of the debtor] as debtor in possession than it would be a personal asset of the trustee, had one been appointed in this case. Much like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the debtor in possession is similarly endowed to bring certain claims on behalf of, and for the benefit of, **all creditors.** (Citations omitted) (Emphasis added).

■ Relevant treatises recognize the scope and applicability of § 544(b) of the Bankruptcy Code to enforcement of Article 6 as well. As set forth in James J. White and Robert S. Summers, Uniform Commercial Code, Section 27–4, p. 243 ft. 18 (4th Ed.1995);

> ... [t]he seller's trustee may avoid the entire transfer and apply the recovery for the benefit of all creditors if the seller files for bankruptcy before the Article 6 statute of limitations expires, even when absent bankruptcy, only the omitted creditor could have set aside the transfer, and only to the extent necessary to satisfy its claim.

Therefore, it is clear that the Plaintiff's recovery is not limited by the amount of prepetition debt in existence at the time of the filing, or by the amount owed to creditors entitled to notice of the transaction at the time of the transaction in question, but who did not receive appropriate notice. The transfer is to be avoided for the benefit of all creditors of the Debtor, including for the benefit of Congress under any claims it may legitimately assert. A determination of the universe of claims of the Debtor has already been undertaken under the claims process, and the Court will not disturb that process. The Court's recognition of the applicability of § 544 of the Bankruptcy Code in determining the appropriate remedy to be granted is separate and apart from the claims adjudication process. Therefore, the Court grants summary judgment in favor of the Plaintiff on the issue of the proper theory to employ in avoiding the transfer, which mandates that the transfer be avoided for the benefit of all creditors of the Debtor, without regard to fixing the universe of claims at this point.

(c) Recovery Limited to Inventory and Equipment

■ The next issue for the Court to decide is whether summary judgment is appropriate to determine whether recovery is limited to only inventory and equipment transferred or its value thereof, or whether recovery extends to the transaction as a whole. As this is a purely legal issue, the Court finds that summary judgment is an appropriate tool to employ to make this determination. The Defendants claim that only the portion of the sale

relating to inventory and equipment, at liquidation value, is recoverable in a bulk sale action. The Plaintiff asserts that the appropriate remedy is to "undo" the transaction in its entirety and award damages equal to the value of *all* of the assets transferred, as reflected in the purchase price of $29,154,924.00. According to the Plaintiff, once the transaction is found to violate the Bulk Sales Law, the fact that a portion of the transaction involves assets not covered by the Bulk Sales Law is of no concern. In addition, the Plaintiff avers that liquidation value is not the standard by which damages are to be measured, but rather the fair market value of the assets transferred at the time of the transaction is the appropriate yardstick of measurement.

With regard to the issue of whether recovery is limited to only the value of any inventory and equipment transferred, the Court finds that the Defendant's argument is correct. The Official Comment to U.C.C. § 6–102 states as follows:

> The transfers included are of materials, supplies, merchandise or other inventory, that is, of goods. Transfers of investment securities are not covered by the Article (on bulk transfer), nor are transfers of money, accounts receivable, chattel paper, contract rights, negotiable instruments, nor things in action generally. Such transfers are dealt with in other Articles, and are not believed to carry any major bulk sales risk.
>
> Official Comment 3 to U.C.C. § 6–102(1).

Although case law on this point is scarce, there is sufficient case commentary to support such a limitation on recovery. *See Bank of the West v. Commercial Credit Financial Services, Inc.*, 655 F.Supp. 807, 816 (N.D.Cal.1987), *rev'd on other grounds*, 852 F.2d 1162 (9th Cir.1988) ("Article Six does not apply to transfers of accounts receivable ... moreover, if accounts are transferred along with property to which Article Six applies, Article Six's remedies are available *only with respect to the transfer of covered property*.") (emphasis added); *Credithrift Financial Corporation v. Guggenheim*, 232 So.2d 400, 401 (Fla.App.1970) ("the authorities are uniform in the conclusion that bulk sales acts do not apply to intangibles such as notes receivable."); *Jim Durio Florist, Inc. v. St. Landry Loan Company*, 484 So.2d 228, 231 (La.Ct.App.1986) (citing *Credithrift Financial Corporation v. Guggenheim* in support of decision to uphold lower court's dismissal of action for alleged violation of bulk sales law where the assets transferred constituted accounts receivable). Although the *Credithrift* case and the *Jim Durio Florist* cases do not involve the transfer of assets covered by the bulk sales laws along with non-covered assets, the Bulk Sales Law specifically limits its applicability to inventory and equipment transferred. It is logical to conclude that the property covered by the Bulk Sales Law should be the only property subject to its reach because the drafters of the Bulk Sales Law recognized that the transfer of inventory and equipment needed this type of protection, not intangibles.

The Plaintiff relies on the case of *Hyland Meat Co., Inc. v. Tsagarakis*, 202 A.D.2d 552, 609 N.Y.S.2d 625 (2nd Dept. 1994) for the proposition that the entire sale is ineffective, regardless of what was sold. The *Hyland Meat* case involved the sale of all of the assets of a restaurant, including real property, fixtures and articles of personal property, without the requisite bulk sale notice, and the Appellate Division, Second Department found that the entire transfer was ineffective. Although some courts have extended the reach of the Bulk Sales Law to cover restaurant assets, no court has gone so far

as to include recovery of intangibles and accounts receivables. Therefore, the *Hyland Meat* case is not applicable to this case and cannot be used to support a finding in this case that all of the Transferred Assets should be included in the calculation of damages without regard to the language of the Bulk Sales Law.

### (d) Valuation of Inventory and Equipment

██ It is well settled law that where the actual assets cannot be reconveyed, based upon the disposition of the assets by the transferee, the estate's representative is entitled to a judgment equal to the market value of those assets. As stated in *Curtina*, 23 B.R. at 979:

> [T]he transferee's liability is for the value of the assets at the date of the non-compliant transfer and not the value at the time of a later resale, nor can such value be reduced by other expenditures of the transferee after the improper transfer . . . . (citations omitted).

In *Curtina*, the court awarded the plaintiff the contract price of the inventory purchased, subject to a reduction based on actual monies on hand and arising from the sale, held in the debtor's account.

The most widely accepted method for determining the value of the assets transferred is based on the contract price. *See In re Villa Roel, Inc.*, 57 B.R. 835, 839 (Bankr.D.D.C.1985) ("The price paid for the items transferred is generally used as the yardstick for determining fair value."); *In re Pritchard*, 8 B.R. 688 (Bankr. C.D.Cal.1981) (Court awarded as damages the purchase price of bicycles transferred by the debtor, rejecting the argument that the liquidation value of the bicycles on the date they were turned over by the transferee to the secured creditor should control.); and *In re Streamlight, Inc.*, 108 B.R. 505 (Bankr.E.D.Pa.1989) (under New York law, a transfer in violation of the bulk sales law obligates the transferee to account to the transferor's creditors for the value of the merchandise transferred, and the damages are measured by the fair value of the goods transferred.).

The Defendant makes two arguments against adopting the contract price for the inventory and equipment as the appropriate damages to be awarded. First, the Defendant claims that the liquidation value of the inventory and equipment is a more appropriate measure of damages because the Debtor was on the verge of bankruptcy and in the event the sale did not take place and a petition was filed, the creditors would only receive liquidation value on the assets. In support of this argument, the Defendant relies on *Jon Greenberg & Associates, Inc. v. ABC Appliance, Inc.*, 207 Mich.App. 81, 523 N.W.2d 823 (1994), which stated in *dicta* that the plaintiff failed to prove damages were sustained as a result of a bulk sale violation because if plaintiff had received timely notice of the sale and had stopped it, the transferor would have most likely filed a petition in bankruptcy and the unsecured creditor body would have received nothing after payment of secured claims. This argument fails on two grounds. First, the very court that rendered the decision in *Jon Greenberg & Associates, Inc.* held in *Tubelite, Inc. v. Lakeshore Glass & Metals, Inc.*, 2000 WL 33529759 (Mich.App.) that the language cited by the Defendants was nothing more than *dicta* and "lacked the force of adjudication." (citing *Edelberg v. Leco Corp.*, 236 Mich.App. 177, 183, 599 N.W.2d 785 (1999)). Therefore, the *Jon Greenberg & Associates* decision is of no precedential value on this issue. Second, following the *Jon Greenberg & Associates* decision for this proposition would require this court to engage in speculation about the fate of the Debtor had the sale not

**22**

gone forward, and this speculation is not based on fact. There is no reason to believe that filing a petition was a foregone conclusion if the sale had not gone forward, and it might have been that another buyer would have appeared who was willing to pay more for the assets. This does not mean that the Court should then ascribe a *higher* value for the assets in question than the price ultimately paid by the purchaser, thereby increasing the damage award in this case.

The Defendant's second argument against adopting the purchase price as the proper valuation of damages is that the purchase price is not an accurate gauge of the true value of the inventory and equipment. According to the Defendant, its valuation of the transferred assets prior to closing was done to determine the total amount of financing that Congress would be willing to make available on the day after the closing after taking book value and discounts for uncollectible receivables and poor inventory sales into consideration. Since Congress only advanced $18 million to satisfy CIT's security interest and there was only about $1.6 million of availability in Congress' financing to IDI immediately after closing, Congress valued all of the assets sold (not just inventory and receivables) at just under $20 million.

This argument is belied by the facts of the case. The transaction in question was an arms length sale of assets between two unrelated parties. The value of the assets were established by a purchase price, fixed after many months of negotiations. The values were confirmed by Defendant's audit prepared by Touche Ross after substantiation of Debtor's books and records, and constitute the unrebutted measure of damages in this adversary proceeding. The value of the inventory and equipment

is established in the Agreement of Sale at a purchase price allocated to those items which totals $14,976,662.00.[1] Schedule 5.1(b) sets forth the agreed upon price of the inventory, in the sum of $13,817.284.00 and Schedule 5.1(c) sets forth the agreed upon price of the fixed assets in the sum of $1,099,448.00. See Exh. L and Exh. M to Plaintiff's Reply Statement filed July 9, 2001.

The Agreement of Sale, annexed to Plaintiff's February 13, 2001 Application in Support of its Motion for Summary Judgment as Exhibit F, permits the buyer (IDI) to select the inventory purchased, pursuant to Section 5.1(b). Section 2.8(b) sets forth a specific formula for valuing the inventory selected.

The financial statements of the Debtor demonstrate that the high quality inventory of the Debtor turned over every 55 days, approximately seven times per year and that less than 1/2 of 1% of the outstanding trade receivables were written off. Furthermore, inventory was "booked" according to the LIFO (Last in, first out) method. Had the inventories been costed under the FIFO (First in, first out) method they would have been approximately $4,839,000 higher in value (based on an inventory of $12,872,000 as of July 2, 1989). See Exh. D, E and F to Plaintiff's Reply Statement filed July 9, 2001.

The audits conducted by the Defendant are in line with the values allocated under the Agreement of Sale, as confirmed by the Defendant's take over report, annexed to the Plaintiff's Reply Statement as Exh. H. The audits themselves have never been produced by the Defendant. In sum, the parties negotiated the sale price over ten months, and the values attached to the assets transferred were audited and re-

---

1. This sum is coincidentally similar to the amount originally requested by Plaintiff based on the amount of unpaid claims of creditors prior to the bulk sale.

audited. They were substantiated by the financial statements of the debtor, and no credible evidence has been introduced to indicate that any other valuation of the inventory and equipment is appropriate in this adversary proceeding. Therefore, the Defendant has failed to overcome the portion of the Plaintiff's motion for summary judgment relating to the valuation of the inventory and equipment and the Court finds that the proper valuation is the value placed on the inventory and equipment under the initial transaction, $14,976,662.00.

### Entitlement to Offset

 Defendant Congress seeks a credit for the sum it paid to CIT to satisfy CIT's existing lien on the assets transferred. While there is no dispute that at the time of the transfer at issue, the assets transferred were subject to a first priority lien in favor of CIT, § 548(c) of the Code expressly excludes lien protection with respect to voidable transfers under § 544 of the Code, such as bulk sales transfers. The only exception to this rule is when the trustee is holding funds traceable as proceeds from the voided bulk sale. *Curtina*, 23 B.R. at 980–981. Both parties agree that the Debtor had none of the proceeds from the bulk sale in its accounts as of the entry of the order for relief.

Section 548(c) of the Bankruptcy Code states:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545 or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

The language of the statute itself expressly excludes transactions voidable under § 544, like bulk sales, and Defendant has failed to provide the Court with any statutory authority for finding to the contrary.

In addition, § 551 of the Bankruptcy Code provides that "[a]ny transfer avoided under section 522, 544, 545, 547, 548, 549 or 724(a) of this title . . . is preserved for the benefit of the estate but only with respect to property of the estate." As a result, liens such as Congress' lien on assets transferred in violation of the Bulk Sales Law are preserved for the benefit of the estate. Although Congress seeks to assert a lien on the assets transferred equal to the funds advanced to CIT, this would run afoul of sections 548(c) and 551 of the Bankruptcy Code, which preserves the asset transferred for the benefit of the estate.

Case law supports this result as well. In *In re Van de Kamp's Dutch Bakeries*, 908 F.2d 517 (9th Cir.1990), the Ninth Circuit rejected a transferee's request that it be rewarded the rights available as the recipient of a fraudulent conveyance under state law, observing that section 551 preserves the interest avoided for the benefit of the estate. Defendant Congress cites to *Coastal Oil New England v. Citizens Fuels Corp.*, 38 Mass.App.Ct. 26, 644 N.E.2d 258 (1995) ("*Coastal I*") for the proposition that an individual creditor's recovery may be limited to its pro rata share of the assets recovered, as there may have existed secured creditors who had priorities which would reduce the amount available to the plaintiff. However, the *Coastal I* case concerned the secured creditors currently existing in the case, not with creditors who, like CIT, have been paid. In *Coastal I*, the Appeals Court of Massachusetts ruled that a creditor of a bulk sale, which occurred in violation of Article 6, could be limited to a pro rata recovery

against the value of the assets transferred, if it were determined that other unpaid creditors existed. The Appeals Court did not rule that the transferees who took with notice of the violation could reduce their overall liability by the amounts that certain creditors of the transferor were paid from the proceeds of the transaction.

The subsequent case history of *Coastal I* bears this out, and reinforces the Plaintiff's argument. In *Coastal Oil New England, Inc. v. Citizens Fuels Corp.*, 9 Mass. L.Rptr. 708, 1999 WL 140139 (Mass.Super.1999) (*"Coastal II"*), the trial court ordered the transferee to notify parties with an interest in the bulk sale in order to give them an opportunity to intervene. Bay Bank, the secured lender of the transferor Beaver Oil Co., Inc. ("Beaver") did intervene, and filed a complaint against Citizens, the transferee, alleging that as the corporate successor of Beaver, Citizens was liable to Bay Bank for the full amount of Beaver's indebtedness. Coastal II affirmed the judgment on behalf of Bay Bank, based upon its successor liability cause of action.

Based on the foregoing findings, the Massachusetts Superior Court in *Coastal Oil New England, Inc. v. Citizens Fuels Corp.*, 10 Mass.L.Rptr. 231, 1999 WL 429841, 40 U.C.C.Rep.Serv.2d 546 (Mass.Super.1999) (*"Coastal III"*), reaffirmed Coastal's judgment in the full amount of its claim, $140,552.99, plus interest from the date of the bulk sales transaction. The court in Coastal III refused to limit Coastal Oil's recovery by Bay Bank's (the lender's) claim, and found that the claims were recovered under two different theories. Coastal was entitled to recover the entire amount of the outstanding indebtedness from Citizens under the Bulk Transfers Act, and Bay Bank was entitled to obtain its judgment against Citizens directly under the corporate successor doctrine, and not against Citizens as a transferee under the Bulk Transfer Act.

Similarly, in this case, the Plaintiff is permitted to recover the full value of the assets transferred which are subject to the Bulk Sales Act, which recovery shall not be reduced by the payments made to IDI pursuant to the Agreement of Sale. These are two different parts of a transaction which will not affect the recovery of the other party. In addition, the Court is mindful of the fact that Congress did receive repayment of the principal in full, with some interest from IDI, for the $18 million advanced by Congress to take out CIT's lien. Therefore, Congress cannot now claim a credit for the amounts it initially paid to CIT for the release of its lien. The Court notes that although Congress paid CIT directly, it was on behalf of IDI, not the Debtor. Congress's loan was to IDI—no loan was made to the Debtor.

The proper method to credit Congress for the funds it has paid to CIT is to permit Congress to file a claim after the value of the property is transferred back into the estate, which claim shall be either allowed or disallowed. In this fashion, Congress can participate in the distribution process along with all of the other creditors if its claim is appropriate. To find to the contrary would eviscerate any remedial purpose of the Bulk Sales Act, and Section 544 of the Bankruptcy Code.

■ There is further statutory support for the prohibition against setoff in an avoidance action. Section 502(d) of the Code provides as follows:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550 or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, ... of this title, unless such entity or such transfer-

ee has paid the amount or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title. Therefore, the transferee of an avoided transfer may not assert a claim against property of the estate unless the property transferred is first reconveyed.

The Defendants have already filed a proof of claim in this case and will not be prejudiced by a judgment avoiding the transfer, as it applies to inventory and equipment, in full. Once the estate is made whole, the creditors' claims, including the claims of Defendant, will be paid from the estate's assets according to the priorities set forth in the Code.

### Award of Interest

■■■■■ An award of pre-judgment interest is normally "a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL—CIO*, 955 F.2d 831, 834 (2nd Cir.1992), *cert. denied*, 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992) ("*Wickham*"), (citing *Loeffler v. Frank*, 486 U.S. 549, 557–58, 108 S.Ct. 1965, 1970–71, 100 L.Ed.2d 549 (1988)) (other citations omitted). While pre-judgment interest is not mandated by federal statute, it may be awarded in trustee avoidance actions at the discretion of the court. *In re Harvard Knitwear, Inc.*, 193 B.R. 389, 399 (Bankr.E.D.N.Y.1996); *In re All American Petroleum Corp.*, 259 B.R. 6, 20 (Bankr.E.D.N.Y.2001); *In re Colonial Realty Co.*, 226 B.R. 513, 526 (Bankr.D.Conn.1998).

Courts have used their discretion to disallow prejudgment interest on awards where it will amount to over-compensation for the plaintiff. *Wickham*, 955 F.2d at 834. Such would be the case where the statute itself fixes damages deemed fully compensatory as a matter of law, *Id.*, citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 699, 714–16, 65 S.Ct. 895, 905–907, 89 L.Ed. 1296 (1945), or where the statute itself provides for full compensation in the form of double or treble damages, as in antitrust laws, or punitive damages. *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 80 (2nd Cir.1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). Courts have also taken into consideration the equities of the case and have declined to award prejudgment interest where the defendant acted without knowledge of the wrongdoing and had no reason to know that the actions taken were wrongful. *Wickham*, 955 F.2d at 834, *citing Board of Comm'rs of Jackson County v. United States*, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939). Another factor courts have taken into consideration is whether the plaintiff was the cause of any delay in recovery. *Wickham*, 955 F.2d at 836, *citing Redfield v. Bartels*, 139 U.S. 694, 695, 702–03, 11 S.Ct. 683, 686, 35 L.Ed. 310 (1891) (interest denied in case where plaintiff failed to commence action for years).

Congress urges the court to deny summary judgment on the issue of prejudgment interest because the determinations to be made are all fact intensive. According to Congress, the Plaintiff would be overcompensated by an award of prejudgment interest at 9% *per annum* as of the date of the transfer because the Plaintiff is already receiving a windfall by virtue of a damage award. In addition, Congress avers that the Plaintiff has not demonstrated that Congress did not act innocently in financing the transaction. Congress alleg-

es that it acted in good faith, believing that the transaction was exempt from the reach of the Bulk Sales Laws.

The Court finds that Congress's arguments fail to provide sufficient cause to deny the motion for summary judgment on this issue. First and foremost, prejudgment interest should be awarded in order to compensate the wronged party for the loss of use of the money in question. *Gordon v. Matthew Bender & Co., Inc.*, 186 F.3d 183, 186 (2nd Cir.1999), *citing Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 83 (2nd Cir.1994); *In re Harvard Knitwear, Inc.*, 193 B.R. at 399. The relief this Court has fashioned is intended to compensate the creditor body of the Debtor by granting a judgment equal to the inventory and equipment transferred in violation of the Bulk Sales Law. This is not a punitive remedy, and takes into consideration the fact that not all of the assets transferred are covered by the Bulk Sales Law. Article 6 mandates compliance with all provisions in order to protect all creditors from conveyances without notice. Violations of Article 6 are held to strict liability and require no showing of intent to defraud. Since the intent of the statute is to protect creditors from conveyances that may harm the estate, an award of prejudgment interest to fully compensate the estate from a wrongful bulk transfer would be consistent with an intent to protect the creditors from such losses. It would be unfair to allow Congress to have had the benefit of the value of these assets over these more than ten years when the retention of such benefit was wrongful.

Its good faith arguments notwithstanding, Congress financed the transaction with knowledge that such a transaction might constitute a bulk transfer governed by Article 6. The indemnification provision in the Purchase Agreement, whereby the Debtor would indemnify Congress for any violation of Article 6, demonstrates that Congress was aware of the potential for Article 6 violations and also of the potential for harm to the creditors that failed to receive notice of the transfer. With knowledge of the potential for Article 6 violations, Congress proceeded to finance the transaction to the detriment of the creditors and to the benefit of Congress.

With regard to the other equitable considerations raised by Congress, the Court finds that there is no evidence to support a finding that either side caused delays in the litigation of the Bulk Sales Action. However, the Court notes that the Bulk Sales Action was transferred to the State Court at Congress' request and urging. Congress has not pointed to any fact which would support a finding that the equities lie against an award of prejudgment interest in this case, other than to assert that an award of prejudgment interest would result in a windfall to the Plaintiff. The Court does not find that the Plaintiff would receive a windfall if prejudgment interest is awarded. Rather, the Plaintiff is merely being compensated for the loss of use of money that the creditors of the Debtor would have enjoyed had the transaction not have taken place, and such an award would not result in the type of overcompensation discussed in the relevant case law. Therefore, summary judgment is appropriate on this issue, and prejudgment interest shall be awarded in favor of the Plaintiff from the date of commencement of this adversary proceeding.

■ The remaining issue is the proper rate of interest to charge. Because this action is predicated on New York substantive law, the rate of interest shall be dictated by New York law as well. *In re Harvard Knitwear, Inc.*, 193 B.R. at 399. N.Y.Civ.Prac.L & R. 5001(a) (McKinney 1992) provides as follows:

Action in which recoverable.

Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

*N.Y.Civ.Prac.L & R.* § 5004 provides:

Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute.

(McKinney 1992).

 Therefore, if the action lies in equity, the court has discretion to fix an appropriate interest rate. Otherwise, unless the statute in question contains a mandatory interest rate, the applicable interest rate for prejudgment interest under New York law is 9 percent.

Neither side has fully briefed the issue of whether the Bulk Sales Law is an action at law or equity and in the event the Court has discretion over the interest rate to apply, Congress has not specifically addressed the appropriate rate of interest to be charged. Given the size of the award and the potential for a very large sum for prejudgment interest depending upon the rate to be charged, it is appropriate for the Court to accept additional briefs on this narrow issue. Therefore, the Court will hold a subsequent hearing to make its determination of the appropriate rate of prejudgment interest to be charged. Each party shall file with the Court a brief addressing this issue within two (2) weeks hereof, and a hearing will be held on June 27, 2002 at 11:00 a.m. on this issue only.

## CONCLUSION

1. Pursuant to § 544(b) of the Bankruptcy Code, the Plaintiff is entitled to a judgment in the amount of the value of the Transferred Assets covered by the Bulk Sales Law.

2. The Bulk Sales Law is limited on its face to recovery of inventory and equipment transferred in violation thereof, and the damages awarded to the Plaintiff shall be limited to those components.

3. The inventory and equipment transferred to IDI were given an aggregate value of $14,976,662.00 pursuant to the Purchase Agreement, which provides the appropriate basis for valuation of same for purposes of fixing damages.

4. Congress has failed to introduce any material issues of fact which would preclude this Court from making such findings pursuant to the Plaintiff's motion for summary judgment.

5. The Plaintiff is entitled to an award of prejudgment interest in order to compensate the Plaintiff for Congress's wrongful retention of the value of the inventory and equipment from the time this action was commenced to date.

6. The Court shall hold a hearing to determine the applicable rate of interest to be awarded to the Plaintiff on June 27, 2002 at 11:00 a.m. on this issue only.

7. Within ten days hereof, the Plaintiff shall settle an Order in regard to all issues decided herein, except for the applicable rate of interest to be awarded.

So Ordered